Clarence R. **EDWARDS** and Richard
James, Plaintiffs,

v.

Thomas R. **SARD**, Defendant.

Civ. A. No. 1983–63.

United States District Court

District of Columbia.

Feb. 25, 1966.

George Cooper, Washington, D. C.,
for plaintiffs.

James Cashman, Asst. Corp. Counsel,
Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

In this case the plaintiffs, two Negro inmates of Lorton Reformatory,[1] a correctional institution operated by the Government of the District of Columbia, complain that they have been discriminated against in the dormitory assignments made at the institution.[2] They seek injunctive relief against these alleged abuses.

Plaintiff Clarence R. Edwards is presently incarcerated at Lorton following conviction for forgery. He is assigned to dormitory No. 8, a dormitory which currently houses Negro inmates only. On August 3, 1962, shortly after his arrival at Lorton, he was assigned to dormitory No. 16. On April 23, 1963, he made a request for a transfer from this dormitory to dormitory No. 1. Both dormitories No. 16 and No. 1 then housed, and continue to house, Negro inmates only. On April 23, 1963, Edwards' request for a transfer was denied.

On July 19, 1965, Edwards was assigned to dormitory No. 8, and on July 21, 1965, he made a request for a transfer from this dormitory to either of dormitories No. 14 or No. 16. On July 22, 1965, this request was denied. At the time Edwards requested this transfer, dormitory No. 14 housed white inmates only and dormitory No. 16 housed Negro inmates only.

Plaintiff Richard James is incarcerated at Lorton following conviction for robbery and is assigned to dormitory No. 15 which presently houses Negro inmates only. On February 5, 1959, shortly after his arrival at Lorton, plaintiff James was transferred to dormitory No. 16, a dormitory housing Negro inmates only. On January 20, 1964, James requested a transfer from dormitory No. 16 to "any other dormitory" on account of friction that existed between him and other inmates residing there. His request was granted on January 24, 1964, when he was transferred back to dormitory No. 15.

## I.

### Jurisdiction

 This Court has jurisdiction to grant injunctive relief in this case under 28 U.S.C. § 1343(4) (1958) which provides a remedy for the legal right established in 42 U.S.C. § 1983 (1958). This latter section reads:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The District of Columbia, in its capacity as supervisor of a penal system, is a "State or Territory" within the meaning of 42 U.S.C. § 1983 (1958), and therefore the section would apply should this Court find an abuse of constitutional power by the District Government. See Sewell v. Pegelow, 291 F.2d 196 (4th Cir. 1961) (Sobeloff, C. J.).

## II.

### Limited Supervisory Power of Courts Over Prisons

 Although this Court has jurisdiction to redress unconstitutional actions on the part of the District of Columbia Government, it clearly does not exist to supervise minutely the operation of the prisons. The responsibility for running the penal system is an executive one. However, that system cannot be operated in violation of law; the law sets the outer limits of executive discretion in administering the correctional system, as well as in other areas of executive activity. See Sewell v. Pegelow, supra; Dixon v. Duncan, 218 F.Supp. 157 (E.D.Va.1963) (racial discrimination at Lorton); Ful-

---

1. Hereinafter referred to as Lorton.

2. Plaintiffs do not complain that any other of the facilities of the prison are operated on a discriminatory basis.

wood v. Clemmer, 206 F.Supp. 370 (D.D.C.1962) (freedom of Muslims to worship at Lorton) (Matthews, J.).

### III.

Are Dormitory Assignments at Lorton Illegal Because They Are Made According to a Policy of Racial Discrimination?

■ Since the decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the course of history in civil rights cases and legislation has made it unmistakably clear that racial discrimination by governmental authorities cannot be tolerated. Therefore, the plaintiffs in this case will prevail in their suit if they convince the Court that a policy of racial discrimination has been followed in making dormitory assignments at Lorton. Since full racial integration is invariably a desirable goal, racial discrimination may be seen as any unjustifiable delay[3] in achieving this goal.

The population at Lorton consists of somewhat over 1,100 Negroes and somewhat over 110 whites, a ratio of about ten to one. Of the 22 dormitories now in service, six are integrated. Of these six, two (Nos. 20 and 24) are preferred housing units. These units contain, respectively, 12 white and 79 Negro inmates; 12 white and 18 Negro inmates. The remaining four integrated dormitories show the following racial mixtures:[4]

| Dormitory No. | Inmates | |
| --- | --- | --- |
| | White | Negro |
| 19 | 31 | 12 |
| 21 | 2 | 48 |
| 22 | 41 | 29 |
| 23 | 9 | 59 |

■ These figures reflect the fact that during the past year the last of the exclusively white dormitories at Lorton was closed. However, one cannot conclude from this closing that no racial discrimination exists at the institution. Cf. Kelly v. Board of Education, 159 F.Supp. 272, 278 (M.D.Tenn.1958). By assigning members of the white minority exclusively to the six integrated dormitories, the effect is of necessity to restrict the opportunity of some members of the Negro majority group to live in these six dormitories. In addition, the effect is obviously to reduce the likelihood that any given Negro inmate will be able to reside in integrated housing.

■ Mr. Charles M. Rogers, Deputy Superintendent of Lorton, who is in charge of making dormitory assignments and is himself a Negro, testified that the following ten criteria[5] are used as guides in making dormitory assignments: (1) age of the inmate, (2) length of sentence and tenure remaining of the inmate, (3) work assignment of the inmate, (4) compatability of the inmate, (5) District Government policy on anti-discrimination, (6) inmate physical health factor, (7) inmate mental health factor, (8) inmate program participation, (9) inmate's prior record, and (10) inmate's disciplinary adjustment. However, when asked whether he considered the race of prisoners as one factor in deciding which dormitory to assign them to, Mr. Rogers answered that he did. While the plaintiffs argue that this latter statement indicates that racial discrimination exists at Lorton, the Court believes that it must be viewed in the context of Mr. Rogers' testimony as a whole, in which the security of the institution played the domi-

---

3. The controlling case law permits delay in the achievement of total integration when "such delay is manifestly compelled by constitutionally cognizable circumstances warranting the exercise of an appropriate equitable discretion by a court." Watson v. City of Memphis, 373 U.S. 526, 533, 83 S.Ct. 1314, 1319, 10 L.Ed.2d 529 (1963). Cf. Brown v. Board of Education, 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

4. Record, 121–25. The plaintiffs relied upon these figures in their proposed Findings of Fact and Conclusions of Law and the figures the defendant supplied in his brief are substantially identical to them.

5. The criteria are set out in Superintendent's Order and Policy Statement No. 67, Plaintiffs' Exhibit No. 2.

nant role to which the various factors of inmate background used in the selection process were subservient.

At the end of Mr. Rogers' testimony, the Court continued the case, requesting the Commissioners of the District of Columbia to indicate to it whether what Mr. Rogers had said showed that the policy of the Commissioners with regard to integration in the dormitories at Lorton was or was not being followed. The Commissioners had a full hearing with representatives of the institution in which they considered a transcript of Mr. Rogers' testimony, and they reported the results of their deliberations to this Court.[6] This report concluded that the District Government's policy order on non-discrimination [7] was being followed at Lorton.

The Court is convinced that the District Commissioners, the defendant Director of Corrections Thomas R. Sard, Superintendent Kermit A. Weakley, and Mr. Rogers have been acting in complete good faith in their supervisory capacities at Lorton and that they have been following the District Government's policy order on non-discrimination. Mr. Sard indicated a sincere awareness of the desirability of achieving the greatest possible intermingling of the races consistent with the security of the institution.[8] Yet he stated his opinion that serious security difficulties might arise should the small white inmate population at the institution be evenly distributed among all of the dormitory units at this time.[9] Such a division would, in the typical case, result in there being no more than four or five white inmates in a dormitory housing 45 or 50 Negro inmates, and in some cases the number of white inmates could, of course, be smaller than this.

An obvious source of racial friction at Lorton is the presence there of a substantial number of members of the Muslim religious sect, who, by a decree of this Court, are allowed to meet and hold religious services at the institution.[10] A basic feature of Muslim religious activity is the kindling of intense racial hatred of the white man, and incidents of verbal abuse and threats prompted by the sect's activities have occurred at Lorton. In addition, testimony indicated that there are at Lorton members of the Ku Klux Klan and other extreme right-wing

---

6. The text of this report, with two minor omissions of figures included elsewhere in this memorandum, is set out in an appendix.

7. Policy Order No. 62–1217, Plaintiffs' Exhibit No. 4, issued by the Board of Commissioners of the District of Columbia on July 17, 1962, requires in paragraph 3(a) that: "Every official and employee under the supervision of the District Commissioners in any department, agency, or instrumentality, or any of its constituent units subject to this order shall act without regard to race, religion, color, ancestry, or national origin in all matters relating to the use and enjoyment of, or assignment or entitlement to, any public facility, accommodation, service or treatment subject to his control, authority, or supervision unless specifically required by statute to do otherwise."

Paragraph 1 of this Order provides that the Department of Corrections is subject to the Order.

8. Mr. Sard testified as follows: "[W]e would like to see a reduction in the number of all-Negro dormitories. We believe that there is an advantage to both races if there can be interracial mixing to the extent that this can be done, and maintain the security and safety of the institution. * * * [W]e feel * * * [intermingling of races] has a socializing effect on that individual. Many of our Negroes are from the southern states and have never before lived in an integrated situation. We believe that there is a benefit to them to be exposed to this. We would like very much to have every dormitory we have integrated if we had a sufficient proportion of white to Negro to do this safely." Record, 286–88.

9. A letter addressed to Chief Judge David L. Bazelon of the United States Court of Appeals for the District of Columbia Circuit and admitted into evidence at the hearing indicated one possible danger to the white inmate, isolated as one member of a small minority in a group dominated by a potentially hostile majority, namely, that he might become the unwilling victim of homosexual advances.

10. Fulwood v. Clemmer, 206 F.Supp. 370 (D.D.C.1962).

groups, and their contact with Negro extremists could clearly prove explosive.[11]

Although analogies to instances of previous judicial intervention to prevent racial discrimination in schools, housing, recreational facilities, and employment may seem at first inviting, upon careful scrutiny the Court is convinced that the differences between these areas and prisons are far more significant than are the similarities. The association between men in correctional institutions is closer and more fraught with physical danger and psychological pressures than is almost any other kind of association between human beings. Moreover, a great many of the inmates of correctional institutions are dangerous men, and those charged with supervising them understandably have less confidence in their ability to adapt peacefully to changed social conditions than one would have in men who reside in society at large. The operation of penal institutions is a highly specialized endeavor, and the sober judgment of experienced correctional personnel deserves the most careful consideration by the courts.

In 1965 the last all-white dormitory at Lorton was closed. At the hearing Director Sard and Superintendent Weakley testified that a seventh integrated dormitory and an eighth integrated work-release dormitory were projected for opening within thirty days. The testimony of the Director and his staff indicates that the integration of Lorton is being carried out in a flexible manner and that, although total integration is being approached circumspectly, progress towards it is steady.

 The plaintiffs, who are dissatisfied with the pace of this progress, have been unable to suggest to the Court any workable formulation for a decree which would give them the relief which they seek. They admit that *"no numerical rule can be laid down for the future without requiring a purposeful maintenance of racial balance which is just as undesirable as a purposeful maintenance of racial imbalance."* Explanation of Plaintiffs' Proposed Order, p. 4. (Emphasis in original.) Yet the plan which they offer for the future—that dormitory assignments be made "without regard to race and without any purposeful intent to create either racial balance or racial imbalance," ibid. (emphasis eliminated) —is too general to serve as a guideline for future administrative conduct at the prison. The testimony of prison authorities and the statement of the Commissioners of the District of Columbia indicate that they believe dormitory assignments are already being made in this manner.

 This Court is convinced that the defendant and his staff have not abused their discretion and that no racial discrimination is being practiced at Lorton today. Although the race of an inmate is a factor—in some cases the determinative factor—in making dormitory assignments, this is so only because prison officials believe that anything approaching total numerical integration would be highly dangerous, given the conditions of racial unrest which exist at Lorton, and that the racial conflicts which would result from such integration would be likely to decrease instead of increase the intermingling of races there. The dangers of prison life, the extreme complexity of the factors which must be considered in making dormitory assignments, and the consequent difficulties in handing down any decree favoring the

---

11. The Court rejects the implications of the plaintiffs' contention—urged in their proposed Findings of Fact and Conclusions of Law—"that Reformatory officials concede that they have the ability to control any disturbance that might occur" (p. 5) as a consequence of total integration of Lorton. The testimony in the record on which plaintiffs base this contention is that of one witness only, Mr. Rogers. The testimony of Superintendent Weakley and Director Sard, on the other hand, reflected serious doubts about controlling the situation should total integration be ordered at this time. Moreover, controlling disturbances is not the only legitimate security concern of prison officials. Equally important is their desire to prevent disturbances from erupting.

plaintiffs in this case confirm the Court's belief that safety and sound administrative practice demand that the opinions of conscientious prison supervisors be given great respect when challenges of this kind are made to them.

This decision is rendered on the basis of current practices at Lorton. Should it appear in the future, however near, that through passage of time or change in circumstances sufficient efforts are no longer being made at Lorton to achieve the maximum integration of the races consistent with the security of the institution, nothing would prevent the question raised in this case from being reopened.

The Court finds on the basis of the foregoing that the plaintiffs in this case have failed to show that a policy of racial segregation has motivated dormitory assignments at Lorton. The defendant is therefore entitled to, and hereby is awarded, judgment denying the plaintiffs any relief.

This memorandum shall constitute the Court's findings of fact and conclusions of law.

## APPENDIX

### RESPONSE OF COMMISSIONERS OF THE DISTRICT OF COLUMBIA TO INQUIRY BY THE COURT

Pursuant to the request of United States District Judge Luther W. Youngdahl in the above entitled cause, the Commissioners of the District of Columbia met on January 7, 1966, to consider whether the assignment of inmates to dormitories at Lorton Reformatory is in consonance with their policy of nondiscrimination. Present were Thomas R. Sard, Director of the Department of Corrections, D. C., and several members of his staff, as well as Milton D. Korman, Acting Corporation Counsel, D. C., and representatives of the Corporation Counsel's office.

The transcript of a portion of the testimony of Charles M. Rogers, Deputy Superintendent of Lorton Reformatory, a witness for the plaintiffs, was read aloud to the Commissioners and they were apprised of the request of the Court. Mr. Rogers explained to the Board in detail the racial distribution of inmates within the twenty-two dormitories of Lorton Reformatory. In brief, the Commissioners are informed that the present inmate population of the Reformatory consists of approximately 1117 Negroes and 111 Caucasians. The total white population is absorbed in six dormitory units which are completely integrated. Sixteen dormitory units house only Negro inmates.

The numerical distribution of white and Negro inmates within the six integrated dormitories reveals no pattern of racial discrimination. Not a single white inmate lives apart from the Negro inmate population at the Reformatory and all facilities at Lorton are completely integrated. When the amended Policy Order of the District of Columbia Government Regarding Non-Discrimination was issued on July 17, 1962, two dormitories at the Reformatory were used to accommodate only white prisoners. That segrated [sic] situation has been eliminated and five dormitories have been integrated since the issuance of the policy order.

Consultation with the Director, Department of Corrections, D. C., and several of his subordinates reveals that dormitory assignments are made under certain administrative criteria, among the more important features of which are security of the institution, safe-keeping of the prisoners, and the compatability of inmates who live in the close quarters prison life necessitates.

The Commissioners are convinced that dormitory assignments, like many other administrative decisions made at Lorton Reformatory, stem purely from penological considerations and are calculated to achieve the basic objectives of prison security and prisoner rehabilitation. Indeed, the Commissioners believe that the operation of the Reformatory on any basis other than the dictates of sound penology can result only in a condition detrimental to good prison administration.

Approximately one month prior to learning of the Court's request for their views concerning dormitory assignments at the Lorton Reformatory, one of the Commissioners had received a copy of an excerpt of a letter addressed to Chief Judge David L. Bazelon of the United States Court of Appeals for the District of Columbia Circuit, obviously from a white inmate of the Reformatory. A copy thereof is appended to this statement. The Commissioners caused an investigation to be made, in the course of which several other reports were made to them by personnel of the Department of Corrections and by other inmates of the several penal institutions. Copies of such reports are also appended hereto. This material is transmitted to the Court so that the Court may know that the conditions at the Reformatory and in other penal institutions have been under careful study by the Commissioners and that the Commissioners have considered carefully the testimony in the case before the Court as well as the peculiar conditions existing in the penal institutions with which their subordinates must deal in the assignment of dormitories and in the other day-to-day operation of the institutions.

The Commissioners believe that the agressiveness [sic] of members of certain religious sects and of men who are denied normal sexual relationships are matters which must be taken into account in the assignment of housing. They are, therefore, of the opinion that, if the white inmate population of Lorton Reformatory were to be more or less evenly distributed throughout the twenty-two dormitories of the Institution solely to achieve integration of those facilities, such a distribution would not only seriously affect the compatibility of the living conditions of the inmates but would constitute assignment solely on the basis of race and would be violative of the Policy Order of the District of Columbia Government Regarding Non-Discrimination.

The Commissioners are in unanimous agreement that the Policy Order of the District Government is presently being fulfilled at the Lorton Reformatory. As hereinbefore stated, they are particularly impressed by, and their conclusion is further motivated by, the numerical assignments in the six dormitories housing both Causasian and Negro prisoners. The division by races in the four open dormitories * * * shows no pattern of favoritism of one group over another. In the other two better, or so-called prestige, dormitories, where separate cells afford a sought-after degree of privacy, it is quite evident that equal treatment of prisoners is the rule * * * .

In summation, the Commissioners are quite satisfied that the integrated staff of the Lorton Reformatory is, with full sincerity and in furtherance of the Commissioners' policy of non-discrimination, doing everything possible within sound penal practices to effectuate the intent and spirit of their order, and are convinced that no assignment of prisoners at Lorton is made on the basis of race.