Leroy BARNETT, Appellant,

v.

Charles M. RODGERS, Superintendent, D. C. Jail, Appellee.

Carl H. CLARK, Appellant,

v.

Charles M. RODGERS, Superintendent, D. C. Jail, Appellee.

Nos. 20940, 20942.

United States Court of Appeals District of Columbia Circuit.

Argued June 28, 1968.

Decided Feb. 18, 1969.

---

Messrs. Ross O'Donoghue and George A. Fisher, Washington, D. C., (both appointed by this court) for appellants.

Mr. David P. Sutton, Asst. Corporation Counsel for the District of Columbia, with whom Messrs. Charles T. Duncan, Corporation Counsel, Hubert B. Pair, Principal Asst. Corporation Counsel, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for appellee.

Before MCGOWAN, TAMM and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

■■ The basic issue before us is the degree to which officials of the District of Columbia Jail are constitutionally compelled to accommodate the dietary laws of the Muslim faith in the bill of fare afforded Muslim inmates. This question became a matter of judicial concern when appellants, Muslim prisoners in the jail,[1] complained of the menu there in essentially similar *pro se* petitions for writs of habeas corpus filed in the District Court. Citing the doctrinal prohibition of their religion against the consumption of swine, appellants alleged that jail authorities had denied their request to "be fed, at least, one full-course pork-free diet once a day and coffee three times daily." Proceeding obviously on the Free Exercise Clause of the First Amendment, they sought an order directing the superintendent of the jail[2] to respect, to that extent, Muslim dietary tenets in the provision of their meals or, alternatively, directing their release from custody on the ground that continued confinement on existing terms constituted cruel and unusual punishment.

The District Court initially dismissed the petitions without hearing. On appeals brought here, we vacated the orders of dismissal, appointed counsel, and remanded the cases to the District Court for hearing.[3] Following remand, the District Court, on appellants' motion,

---

1. During the course of this litigation, both appellants were transferred from the jail to a penal facility operated by the District's Department of Corrections at Lorton, Virginia. But since for the time being we treat these petitions as prayers for injunctive relief, see note 4, *infra*, and since counsel for appellee concedes that appellants may be returned to the jail, these cases are not moot. Richey v. Wilkins, 335 F.2d 1, 6 (2d Cir. 1964); Pierce v. La Vallee, 293 F.2d 233, 234 (2d Cir. 1961). And although, because of the pendency of the litigation and the alternative prayer for habeas corpus, the legality of these transfers may be questioned, see F.R.App.P. § 23(a); D.C.

Code §§ 16-1903, 16-1904 (1967 ed.), it will be time enough to consider our jurisdiction in habeas corpus if and when consideration of that remedy becomes necessary.

2. Appellants' petitions were filed while appellee's predecessor was still superintendent of the jail. When, during the course of the proceedings in the District Court on remand, appellee succeeded to that office, he became automatically substituted as the respondent. F.R.Civ.P. 25(d) (1).

3. Barnett v. Preston, No. 20,577 (D.C. Cir. Nov. 22, 1966); Clark v. Preston, No. 20,145 (D.C.Cir. Nov. 22, 1966).

treated the petitions as alternative applications for mandamus or habeas corpus [4] and, without objection, consolidated. them for hearing.

Uncontested evidence at the hearing established the scope and strictness of the Muslim injunction against the eating of swine. A Muslim minister testified that the ban is absolute, and extends to all pork products and to all food prepared with pork derivatives. Another Muslim testified that the interdiction "is a life or death matter." "[I]f our lives depend on it," he explained, "we can't eat pork."

The record discloses, however, sharp conflicts in the evidence as to the board available to prisoners unwilling to partake of pork.[5] Appellants' witnesses, including a former inmate who had worked in the jail kitchen, testified to an extensive inclusion of pork in the prison fare. "[W]e would have pork meats maybe five or six times," one witness said, "before we had a pork-free meal." The jail's chief steward disagreed, asserting that of the 14 main dishes served at lunch and supper during a week, typically only about two contain pork. Appellants, however, had subpoenaed cop-

ies of the jail's recent menus and, upon inspecting them, the chief steward admitted that five of the 14 meat courses in the most recent weekly menu contained pork.

Appellants' witnesses also testified that pork is used to prepare such items as hamburgers, meat loaf, chili con carne, and gravies served with non-pork meats. Appellee's witnesses deny this, but admit that beside pork in its more obvious forms, it is present in macaroni and cheese, hot dogs, cold-cuts, and various cooked luncheon meats. The chief steward stated that pork is used to season about half of the green vegetables, as well as beans, onions, stewed tomatoes, and other side dishes. All told, it was said, perhaps two-thirds of all the meals served at the jail contain pork or foods cooked with pork, and no substitutes are offered.

While the District Court made no specific finding in this regard, it is evident that pork and pork derivatives eventuate in some form in a substantial number of the meals provided inmates at the jail.[6] Moreover, appellants complain that they do not eat all of the ostensibly

4. This was the course followed in Fulwood v. Clemmer, 206 F.Supp. 370 (D.D.C. 1962). See also Long v. Parker, 390 F. 2d 816, 819 (3d Cir. 1968); Walker v. Blackwell, 360 F.2d 66, 68 (5th Cir. 1966). As appellants explain their litigative desires:

Appellants seek only a declaration of their right to believe in, and to adhere to, their religion, free from the constant challenge to their Muslim commitment presented by the Jail's extensive use of pork in making up, or preparing, meals. This can be accomplished in any one of several ways. It can be done by way of a writ directing appellees to take specified action to immediately alleviate the situation. * * * Alternatively, the situation could be remedied by ordering appellees to prepare a set of directives for issuance to all institutional personnel instructing them to furnish Muslim inmates a reasonably balanced diet. * * * Perhaps this Court could simply declare appellants' rights and remand this case to the District Court to work out the details of a specific writ or order with the aid of

additional testimony by expert witnesses, if necessary.

Injunctions against their custodians under 28 U.S.C. § 1343 and 42 U.S.C. § 1983 are also available to prisoners in the custody of the Department of Corrections. Sewell v. Pegelow, 291 F.2d 196, 198 (4th Cir. 1961); Edwards v. Sard, 250 F.Supp. 977, 978 (D.D.C.1966); Banks v. Havener, 234 F.Supp. 27 (D.D.C.1964). We accommodate appellants' desires as to remedy without encountering procedural difficulties simply by treating their petitions, for present purposes at least, as prayers for injunctive relief. See Roberts v. Pegelow, 313 F.2d 548, 549–550 (4th Cir. 1963).

5. Of the jail's inmate population of 764 at the time of the hearing on remand, 35 were recorded as Muslims but from 40 to 100 attended Muslim services. The record discloses that not all Muslim prisoners formally declare their religious affiliation to the jail authorities.

6. Testimony of the jail's chief steward established that for the month of January, 1967, the jail received approximately 5,850 pounds of pork products among its

non-pork dishes because they cannot always ascertain that they are pork-free. Many of the dishes contain pork in covert forms, and these the menus do not identify,[7] and even if they did they are not generally posted in areas to which prisoners have access. Not knowing what future servings will bring, they cannot anticipate a meal containing pork items by filling up at a previous all-non-pork meal.

When appellants rested their case-in-chief, the District Court granted a defense motion to dismiss.[8] The court found that "[t]he inmate population of the District of Columbia Jail is fed a well balanced and wholesome diet," and that appellants may "by refraining from eating those things that they consider objectionable practice their religion."[9] The court further found that "[t]he diet provided at the * * * Jail is prepared with no special consideration given to any prisoner or religious denomination."[10] We conclude, however, that this disposition failed to take into account factors of the highest relevance to appellants' constitutional claims. We accordingly reverse the dismissal orders appealed from and remand the cases to the District Court for further proceedings.

## I

Our starting point is the teaching of Cantwell v. Connecticut [11] that the First Amendment

"embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct re-

---

provisions. This compares with 7,166 pounds of beef, 483 pounds of beef liver, 554 pounds of veal, 1,832 pounds of chicken, and 1,100 pounds of undescribed fish during the same period. The Muslim dietary injunction also extends to certain types of fish, with the result that the record is unclear whether appellants were free to partake of any or all of the fish.

7. The problem would apparently be greatest with prepared meats made partially from pork and with vegetables seasoned with pork. The chief steward pointed out, however, that the pork content of vegetable dishes is obvious when they are seasoned with strips of braised bacon.

8. At the conclusion of the hearing, the court stated:

[P]etitioners are men who have violated the criminal laws and who are now in prison because of that violation. When one goes to prison for a violation of the criminal laws, their liberty is necessarily curtailed, and the reasonable rules of the prison are entitled to respect and obedience from the prison population. Now, in this case it has been indicated by the evidence that food is supplied there of a wholesome nature. If the petitioners do not wish to eat pork products they may eat other things; in that way they may practice their religion by refraining from eating those things that they consider objectionable. If the petitioners were entitled to have their idea of the proper

diet, that is to be free of pork, then every other inmate of the prison would be entitled to the same consideration. For instance prisoners of the Jewish faith would have to have their particular requirements of diets observed, and any other religious sect who had diet requirements, they would have to have theirs met, and apparently from the evidence here there is no discrimination of any kind practiced. The diet is provided and no special consideration is shown any prisoner in connection with his religion as to food, so I will dismiss the petitions here.

9. Appellee does not contend that appellants' faith is not a religion within First Amendment protection. See Banks v. Havener, *supra* note 4, 234 F.Supp. at 29; Fulwood v. Clemmer, *supra* note 4, 206 F.Supp. at 373. Compare Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L. Ed.2d 1030 (1964); Sostre v. McGinnis, 334 F.2d 906, 907–908 (2d Cir.), cert. denied 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed. 2d 96 (1964); Childs v. Pegelow, 321 F. 2d 487, 490 (4th Cir. 1963), cert. denied 376 U.S. 932, 84 S.Ct. 702, 11 L.Ed.2d 652 (1964).

10. Appellants do not, on these appeals, claim that the jail's food service policies were applied to them in a discriminatory manner.

11. 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

mains subject to regulation for the protection of society." [12]

Nonetheless, when governmental regulation of action within the reach of the First Amendment is challenged, "[i]t is basic that no showing merely of a rational relationship to some colorable [governmental] interest would suffice." [13] Where governmental activity impairs individual ability to abide religious beliefs, two demonstrations become essential to its validity. The first is a clear showing that "any incidental burden on the free exercise of appellant's religion [is] justified by a 'compelling state interest in the regulation of a subject within the State's constitutional power to regulate * * *;'" [14] on this score, "[o]nly the gravest abuses, endangering paramount interests" [15] can engender permissible limitations on free exercise. The second is an equally convincing showing that "no alternative forms of regulation would combat such abuses without infringing First Amendment rights." [16] For "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." [17] However attractive the end to be achieved, the means employed must hoard First Amendment values.

 But appellee would have us believe that he need not make these showings because of appellants' status as his prisoners. Such is not our understanding of the law. It is undoubtedly true that, because the exigencies of governing those in prison are different from and greater than those in governing those without, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by considerations underlying our penal system." [18] "[B]ut it has never been held that upon entering a prison one is entirely bereft of all his civil rights and forfeits every protection of the law." [19] To say that religious freedom may undergo modification in a prison environment is not to say that it can be suppressed or ignored without adequate reason. And although "within the prison society as well as without, the practice of religious beliefs is subject to reasonable regulations, necessary for the protection and welfare of the community involved," [20] the mere fact that government, as a practical matter, stands a better chance of justify-

12. *Id.* at 303–304, 60 S.Ct. at 903.

13. Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963). Similarly, in West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943), the Court stated: "The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds."

14. Sherbert v. Verner, *supra* note 13, 374 U.S. at 403, 83 S.Ct. at 1793, quoting NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

15. Sherbert v. Verner, *supra* note 13, 374 U.S. at 406, 83 S.Ct. at 1795, quoting Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945). See also West Virginia State Bd. of Educ. v. Bar-

nette, *supra* note 13, 319 U.S. at 639, 63 S.Ct. 1178.

16. Sherbert v. Verner, *supra* note 13, 374 U.S. at 407, 83 S.Ct. at 1796.

17. Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). See, e. g., Carroll v. President & Commissioners of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (U.S. Nov. 19, 1968); Schneider v. New Jersey, 308 U.S. 147, 161–162, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

18. Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). See note 21 *infra*, and accompanying text.

19. Sewell v. Pegelow, *supra* note 4, 291 F. 2d at 198. See also Note, Beyond the Ken of the Courts: A Critique of Judicial Refusal to Review the Complaints of Convicts, 72 Yale L.J. 506 (1963).

20. Long v. Parker, *supra* note 4, 390 F.2d at 820.

ing a curtailment of fundamental liberties where prisoners are involved does not eliminate the need for reasons imperatively justifying the particular retraction of rights challenged at bar.[21] Nor does it lessen governmental responsibility to reduce the resulting impact upon those rights to the fullest extent consistent with the justified objective.[22]

## II

The record supports the District Court's findings so far as they go, but an insuperable difficulty emanates from the absence of findings bearing upon the criteria that are constitutionally crucial. There is no finding as to whether any particular "considerations underlying our penal system"[23] warrant the tax on conscience that the jail's food service policies require appellants to endure. Nor is there a finding as to whether that program could not be administered in such a way as to lighten or eliminate its burden on free religious exercise. And our own scrutiny of the record has revealed little to legally support the program as it is now conducted.

The acting superintendent of the jail and the chief steward testified that the menus are planned to provide a well-balanced diet within a budgetary allocation of 90 cents of food materials per prisoner per day. They conceded, however, that the planning is done without respect for the fact that some prisoners cannot dine on pork. They stated that menus are prepared without regard for

other religions as well, explaining that the usual serving of fish for one meal on Friday is not "just for Catholics. It's just a tradition, the same as Turkey for Thanksgiving." The only hint of any practical limitation on the arrangement appellants propose is found in the following interchange:

Q. You have received no directives then, in supplying meals where a person who could not eat pork could obtain a balanced meal?

A. If we did for one religion we would have to do it for another.

Q. Well, what other religions do you have to contend with?

A. Well, there's the Jewish religion, and there is the Catholic religion and they have a lot of days that they cannot eat specific things.

This, we think, completely misses the point. Appellants do not seek, either for themselves or other Muslims, a full menu tailored specially to their religious beliefs. Their request for "one full-course pork-free diet once a day and coffee three times daily" is essentially a plea for a modest degree of official deference to their religious obligations. Certainly if this concession is feasible from the standpoint of prison management, it represents the bare minimum that jail authorities, with or without specific request, are constitutionally required to do, not only for Muslims but indeed for any group of inmates with religious restrictions on diet. But we are not told why appellee could not equally ac-

21. Price v. Johnston, *supra* note 18, 334 U.S. at 285–286, 68 S.Ct. 1049, where the Court looked toward a case-by-case determination by lower courts of whether "reasonable necessity * * * dictates" retraction of the questioned right—pro se argument of an appeal from a criminal conviction—from inmates. See also Howard v. Smyth, 365 F.2d 428, 431 (4th Cir.), cert. denied 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449 (1966); Banks v. Havener, *supra* note 4, 234 F.Supp. at 29.
"The responsibility for running the penal system is an executive one. However, that system cannot be operated in violation of law; the law sets the outer

limits of executive discretion in administering the correctional system, as well as in other areas of executive activity." Edwards v. Sard, *supra* note 4, 250 F. Supp. at 978. See also Rivers v. Royster, 360 F.2d 592 (4th Cir. 1966); Childs v. Pegelow, *supra* note 9, 321 F.2d at 490; Fulwood v. Clemmer, *supra* note 4, 206 F.Supp. at 375; Sewell v. Pegelow, *supra* note 4, 291 F.2d at 197–198. Compare Long v. Parker, *supra* note 4; Banks v. Havener, *supra* note 4.

22. See notes 16–17, *supra*.

23. Price v. Johnston, *supra* note 18, 334 U.S. at 285, 68 S.Ct. 1049, quoted in text at note 18, *supra*.

commodate, to some extent at least, appellants' supplication and the needs of any other such group as well.

There is no indication in the record that there is any budgetary constraint on seasoning fewer vegetables with pork, preparing non-pork-seasoned alternatives when pork-seasoned vegetables are served, or providing non-pork substitutes for main dishes of pork. The record is also barren of any reason why the jail could not post the weekly menus with indications added as to which dishes contain pork. Nor does there appear any reason why the pork dishes that are served could not be distributed more evenly throughout the week. It is obvious that advance publication of the menus with designations as to the pork content of the listed items, and the spacing of such dishes to scatter them as far as possible, would at least reduce the area of constitutional concern. The jail already mimeographs the menus, and at least two prison officials review them to insure well balanced meals for prisoners without religious scruples against consuming pork. Appellee has not told us

why they could not thus narrow the impact of incarceration upon appellants' religious practices.

 That penal as well as judicial authorities respond to constitutional duties is vastly important to society as well as the prisoner. Treatment that degrades the inmate, invades his privacy, and frustrates the ability to choose pursuits through which he can manifest himself and gain self-respect erodes the very foundations upon which he can prepare for a socially useful life.[24] Religion in prison subserves the rehabilitative function by providing an area within which the inmate may reclaim his dignity and reassert his individuality.[25] But, quite ironically, while government provides prisoners with chapels, ministers, free sacred texts and symbols,[26] there subsists a danger that prison personnel will demand from inmates the same obeisance in the religious sphere that more rightfully they may require in other aspects of prison life.[27] This danger is not chimerical. In recent years, against the directives of the District of Columbia Commissioners,[28] Muslim inmates in the

24. E. Goffman, On the Characteristics of Total Institutions, in Asylums 7, 11–48, 57–58 (1961); G. Sykes, The Society of Captives, 12, 32, 63–83 (1966). Excerpts from both writings are to be found in R. Donnelly, J. Goldstein & R. Schwartz, The Criminal Law 428–32 (1962). We may take judicial notice of accredited social studies and consider them "precisely as though their content had been admitted as evidence in the case." Cooper v. Pate, 324 F.2d 165, 166–167 (7th Cir. 1963), rev'd on other grounds 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). Compare Brown v. Board of Educ., 347 U.S. 483, 494 n. 11, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Beauharnais v. Illinois, 343 U.S. 250, 258–263, 72 S. Ct. 725, 96 L.Ed. 919 (1952).

25. Goffman, *supra* note 24 at 25; Sykes, *supra* note 24 at 34. See also Fulwood v. Clemmer, *supra* note 4, 206 F.Supp. at 372. As the court stated in *Fulwood*, "[t]o him [the inmate-petitioner] the main attraction of the Muslim faith is that it gave him something to associate himself with, something to uplift him from the degradation to which he had fallen." *Id.* And as a prison official sim-

ilarly commented, it " 'is in some way related to increasing his status as a negro [sic] * * *.' " *Id.* It has been observed that Muslims have had amazing success in reforming apparently hopeless recidivists. C. Lincoln, The Black Muslims in America 82 (1960).

26. For a discussion of this support of religion under the auspices of the District's Department of Corrections, see Fulwood v. Clemmer, *supra* note 4, 206 F.Supp. at 374–375.

27. *Goffman, supra* note 24, at 7, 9, 22, 36, 69, 89, 114–16; *Sykes, supra* note 24, at 32.

28. Discussed in Fulwood v. Clemmer, *supra* note 4.

After the remand in Sewell v. Pegelow, *supra* note 4, and while an appeal was pending, the Superintendent of Lorton Reformatory submitted a letter of assurances to the Court of Appeals that forecast significantly changed practices in regard to Muslims. Sewell v. Pegelow, 304 F.2d 670 (4th Cir. 1962). The Department subsequently, on grounds found to be legally unjustifiable, withdrew the privileges the letter had assured. Banks

custody of the Department of Corrections have been deprived of the most basic religious liberties, which only by court order have been restored.[29]

We do not reach the question whether appellee has violated the Constitution here.[30] We do hold that the District Court erred in dismissing appellants' petitions without determining whether the impediments to appellants' observance of their dietary creed have compelling justifications,[31] and whether the governmental purposes and operations responsible for those impediments could feasibly be "pursued by means that [less] broadly stifle fundamental personal liberties." [32]

We remand these cases to the District Court for further proceedings to determine whether the provision of meals at the District Jail can be squared with constitutional requirements, and to award its decision accordingly. In deference to appellee's admitted authority within the limits set by the Constitution, the court will, as the first step, afford him the opportunity to present a plan which he believes meets constitutional requirements.

Reversed and remanded.

TAMM, Circuit Judge (concurring only in the result):

Insofar as the majority opinion only remands these cases to the District Court for further proceedings, I am willing, reluctantly, to concur in that action. While rugged protestations of violations of constitutional guarantees are always heartening, I fear that the majority opinion magnifies the legal issue herein unhampered by a practical evaluation of all of the factors involved. Readily recognizing, if not accepting, the currently prevalent philosophy that hard-fisted treatment of prisoners is unconscionable, I cannot accept the proposition that a necessary corollary of that belief is that we display softheadedness. I fear that in situations like the present case our entire approach has somehow slipped out of synchronization when in our concentration of energies addressed to First Amendment guarantees, we completely lose sight of the objectives of a criminal law system utilizing imprisonment, in part at least, as a punishment for crime. It is not difficult to visualize situations in which judicial mandate would be justified, even required, to correct affirmative conduct upon the part of prison administrators which patently abrogates the constitutional rights of inmates, but the record before us in the present case does not arouse in me a challenge to strike down with the fervor of the agonized ancient mariner, a pernicious and constitutionally evil practice.

I do not share my brethren's views that the factual situation herein "stifle[s] fundamental personal liberties." As footnote 10 of the majority opinion sets forth, the appellants do not "claim that the jail's food service policies were applied to them in a discriminatory manner." To the contrary, appellants request that the jail authorities discriminate against other prisoners by affording the appellants special privilege.

I am concerned that the majority's opinion is creating the nucleus of a vacuum by finding real dangers of constitutional dimension in a record which does not justify the use of such appealing phrases as "retraction of rights," "tax on conscience," "burden of free religious exercise," "degrades the inmate, invades his privacy," etc. The record before us establishes that on a budget of ninety cents a day per prisoner the jail author-

---

v. Havener, *supra* note 4, 234 F.Supp. at 29. See also Fulwood v. Clemmer, *supra* note 4.

29. See Fulwood v. Clemmer, *supra* note 4; Banks v. Havener, *supra* note 4. See also note 28, *supra*.

30. As the cases were dismissed at the close of appellants' presentations, appel-

lee never had an opportunity to rebut the prima facie showing of a constitutional wrong made out by appellants.

31. See notes 14–15, *supra*, and accompanying text.

32. Shelton v. Tucker, *supra* note 17, 364 U.S. at 488, 81 S.Ct. at 252.

ities attempt to serve a balanced diet to all prisoners without any preferential treatment of any group on religious or other grounds. Moslem, Jew, Catholic and Protestant are served identical menus limited by budgetary considerations to uniformity for all prisoners. That this program in some way restricts an appellant or other prisoner from "reclaim[ing] his dignity and reassert[ing] his individuality" and "frustrates the ability to choose pursuits through which he can manifest himself and gain self-respect" certainly erodes my understanding of the dimensions of First Amendment protection. I fear that my learned brethren of the majority are in this case pursuing an abstract constitutional issue for its own sake and are creating an opus monstrous of ends without means. If the ultimate outcome of these proceedings is to be judicial supervision of penal institutions in such minute detail as to encompass even the selection and makeup of daily menus and direction of the service of coffee three times a day (as appellants demand) all bottomed upon the theory that there is religious freedom involved, the court having opened this Pandora's Box must not hereafter complain about hornets.