Edward Joseph X. CHAPMAN, Plaintiff,

v.

George PICKETT et al., Defendants.

No. 75–2–041.

United States District Court,
C. D. Illinois.

April 18, 1980.

Diane Geraghty, Northwestern Legal Assistance Clinic, Joseph Kattan, Thomas F. Geraghty, Northwestern Legal Clinic, Chicago, Ill., for plaintiff.

Warren White, Asst. U. S. Atty., Danville, Ill., for defendants.

## JUDGMENT

BAKER, District Judge.

This is a civil rights action arising under 42 U.S.C. § 1983 concerning the First and Eighth Amendment rights of a Black Muslim prisoner who was placed in segregation for some 9½ months following his refusal on religious grounds to handle pork during a kitchen clean-up detail.

The case is here on its second remand. *Chapman v. Pickett*, 586 F.2d 22 (7th Cir. 1978) *(Chapman II)*; *Chapman v. Kleindienst*, 507 F.2d 1246 (7th Cir. 1974) *(Chapman I)*.

## FACTS

The facts of the case to this point are set forth in *Chapman II*:

Edward Joseph X. Chapman was a prisoner in the federal penitentiary at Leavenworth, Kansas, when, on October 4, 1972, he was transferred to the Marion, Illinois, penitentiary. On October 9 Chapman was assigned to the kitchen detail, which assignment included transporting food carts and clearing food off of them. When Chapman discovered that the food trays in the carts contained pork, he went to his supervisor, defendant J. E. Brown, and informed him that because of the beliefs of his Black Muslim faith, he could not handle the pork on the trays. According to his testimony at trial, Brown then offered Chapman the use of either gloves or various kitchen utensils to enable him to complete the task. While Chapman at trial denied that he was offered these, he did acknowledge that, regardless of such an offer, he would still have refused to do the work, since even indirect touching was forbidden. Brown then advised Chapman that he would be forced to write a disciplinary report on Chapman if the task were not performed. Chapman responded by saying that the last man who had written a report on him concerning an incident of this nature had been "blown out of an oven" at Leavenworth just two months previously.

After the incident Brown filed a report charging Chapman with violating Prison Code § 303, "Failing to perform work as instructed by a supervisor." His report also mentioned the Leavenworth remark. An investigative report, completed the day of the incident by another official and sent to the prison's Adjustment Committee, stated that "Chapman had a very good attitude." It noted that "apparently through Chapman's efforts someone had removed the pork from the cart and Chapman had finished cleaning the cart."

On October 11 the Adjustment Committee, which included defendants Jack Culley, Earl Buzzard, and E. M. Cage, met to consider Brown's report. Chapman was present and, upon having the report read to him admitted the facts of the incident, again explaining that his refusal was the result of his Black Muslim beliefs. The Committee decided to punish Chapman by placing him in the segregation unit for an indeterminate term.

Chapman's status in segregated confinement was reviewed periodically. At least once during this confinement Chapman sought a formal explanation of his confinement from defendant George Pickett, warden at Marion, and requested immediate release. No reply from Pick-

ett was received. During Chapman's confinement on March 15, 1973, Pickett received a copy of a letter dated March 9, 1973, from the Director of the Federal Bureau of Prisons, Norman A. Carlson, in which the Director stated to Congressman Charles Rangel that "[w]e have re-examined the situation and have communicated to the heads of our facilities instructions not to assign individuals to the details where they must work with pork if it is against the religious beliefs of those men." Chapman was not returned to the general prison population, however, until July 25, 1973.

586 F.2d at 24.

*PROCEDURAL HISTORY*

The procedural history of the case is somewhat lengthy. Chapman brought suit for injunctive and declaratory relief and for damages alleging (1) violation of his First Amendment right to free exercise of religion, (2) denial of procedural due process at the disciplinary hearing which preceded his segregation, and (3) cruel and unusual punishment in violation of the Eighth Amendment by assignment to segregation for over nine months. In the first trial, the district court, after hearing testimony from two witnesses, refused to hear further evidence. Thereafter, the court entered judgment for the defendants on the grounds that Chapman had failed to prove any of the allegations in his complaint and that his claim for a mandatory injunction was moot since he had already been released from segregation.

On appeal, the Court of Appeals affirmed the denial of a mandatory injunction ordering release but reversed the dismissal of the claims for damages and for declaratory and prohibitive injunctive relief as well as "further appropriate relief, including the expurgation of his prison record." 507 F.2d at 1249. The reviewing court further held (1) that the facts made out a *prima facie* case of a First Amendment violation, (2) that the trial court had erred in terminating testimony, (3) that the plaintiff had not been denied procedural due process. The appellate court made no rulings on the Eighth Amendment claim due to the inade-

quacy of the record. The case was remanded for a new trial.

At retrial, the district court never reached the merits of plaintiff's First Amendment claim. The court found that the defendants had a qualified official immunity from liability for damages under the First Amendment and that the plaintiff's request for injunctive and declaratory relief was mooted by his release on parole and by the new policy adopted by the Federal Bureau of Prisons exempting Black Muslims from handling pork. The trial court also found that the plaintiff's confinement was disproportionate to his offense after May 5, 1973, and violated the Eighth Amendment, but ruled that the plaintiff was not entitled to money damages because he had failed to prove actual damages.

On appeal the second time, the Court of Appeals affirmed the district court's finding of qualified immunity on the First Amendment issue. It also affirmed the district court's finding that the plaintiff's request for declaratory and injunctive relief against future infringement of his religious beliefs was moot, but ruled that a request for an injunction against future use of the plaintiff's punishment record was not moot. The appellate court also affirmed the district court's finding of an Eighth Amendment violation, but reversed the ruling as to the date of the violation and the plaintiff's entitlement to damages. The case was again remanded.

The issues remanded by the Court of Appeals are:

(1) Whether Chapman's First Amendment right to free exercise of religion was violated and, if so, whether the record of his punishment should be expunged.

(2) The date the Eighth Amendment violation began.

(3) What damages Chapman is entitled to receive as a result of the Eighth Amendment violation.

On January 25, 1980, this court conducted an evidentiary hearing to determine the additional facts necessary to carry out the Court of Appeals' mandate. From the tes-

timony presented, the court makes the following additional findings:

(1) On October 11, 1972, Chapman was initially assigned to "short-term segregation" status, where he remained for some 2 to 3 months before being reassigned to "long-term segregation" or "control" status.

(2) Chapman was returned to "short-term segregation" status in June, 1973, and returned to the general prison population on July 25, 1973.

(3) While he was in "short-term segregation," the Adjustment Committee reviewed Chapman's assignment approximately every 10 days.

(4) During the time he was assigned to "control" status, he was reviewed by the Control Unit Committee approximately every 30 days.

(5) Chapman's assignment to segregation did not alter the physical conditions of his confinement. He had the same type of cell and food. He had books but could not go to the library. He had the opportunity to work. He had some physical exercise but could not go to the regular prison recreation activities.

(6) Chapman refused to handle pork because he believed that to do so would contravene the teachings of Elijah Muhammed and the principles of the Black Muslim religion of which Chapman was an adherent.

(7) The climate at Marion during the period of Chapman's segregation was one of extreme stress and tension due to work strikes and other inmate activities.

(8) Chapman had a history of disciplinary problems in the federal prison system, although the only charge of a violent nature was rescinded.

*FIRST AMENDMENT ISSUE*

The court must first determine whether punishing Chapman for refusing to follow a supervisor's order violates the First Amendment where the order was to handle pork and where Chapman informed the supervisor that it was against his religious beliefs as a Black Muslim to handle the pork. So far as this court can determine, this specific issue is of first impression.

Historically, the courts declined to interfere with the administrative decisions of prison officials. *Evans v. Moseley*, 455 F.2d 1084 (10th Cir. 1972) *cert. denied* 409 U.S. 889, 93 S.Ct. 160, 34 L.Ed.2d 146 (1977). This "hands-off doctrine", however, is slowly being replaced by the view that prisoners retain their fundamental constitutional rights, albeit subject to limitations, after incarceration.

> Federal courts sit not to supervise prisons but to enforce the constitutional rights of all "persons," including prisoners. We are not unmindful that prison officials must be accorded latitude in administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations but persons in prison, like other individuals, have the right to petition the Government for redress of grievances which, of course, includes "access of prisoners to the courts for the purpose of presenting their complaints."

*Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam).

Free exercise of religion is among those rights retained by the incarcerated. *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). The growth of the Black Muslim religion in particular has created increasing conflict within the prisons and has forced the courts to focus on the permissible scope of restrictions on prisoners' religious rights. *Wilson v. Prasse*, 463 F.2d 109 (3rd Cir. 1972); *Barnett v. Rodgers*, 410 F.2d 995 (D.C.Cir. 1969); *Cooper v. Pate*, 382 F.2d 518 (7th Cir. 1967).

The cases have involved refusal by prison officials to recognize the Black Muslim faith as a religion, *Bryant v. McGinnis*, 463 F.Supp. 373 (W.D.N.Y. 1978); denial of access to Black Muslim religious literature, group worship services and correspondence with spiritual leaders and refusal of requests for special diet, *Wilson v. Prasse, supra; Walker v. Blackwell*, 411 F.2d 23 (5th Cir. 1969); *Barnett v. Rodgers, supra; Cooper v. Pate, supra; Bryant v. McGinnis*, 463 F.Supp. 373 (W.D.N.Y. 1978); *Cochran v. Rowe*, 438 F.Supp. 566 (N.D.Ill. 1977);

and punishment for prisoner use of Muslim names, *Masjid Muhammad—D.C.C. v. Keve,* D.C., 479 F.Supp. 1311 (D.Del. 1979).

The courts, however, have developed no uniform test for determining when a prisoner's First Amendment rights have been violated. At best, they conduct a precarious balancing between free exercise of religion and the prison's interest in security, orderliness and administrative efficiency and convenience. Comment, *The Religious Rights of the Incarcerated,* 125 U. Pa. L. Rev. 812 (1977).

Some courts have held that the proper test for determining the validity of prison rules and regulations restricting practice of the Muslim religion is whether such rules are "unreasonable and unjustified with respect to the need of prison restraints and discipline." *Wilson v. Prasse, supra.* Other courts require the government to show a compelling state interest to justify the restrictions on Islamic or any other religious activities plus a showing that the alleged restrictions are the least restrictive means necessary to protect that interest. *Walker v. Blackwell, supra; Barnett v. Rodgers, supra; Cochran v. Rowe, supra.*

The Seventh Circuit, in *Cooper v. Pate, supra,* its leading decision in this area, states:

> It is clear that prison authorities must not punish a prisoner nor discriminate against him on account of his religious faith. But although a prisoner retains his complete freedom of religious belief, his conviction and sentence have subjected him to some curtailment of his freedom to exercise his beliefs.

Courts will closely scrutinize the reasonableness of any restriction imposed on a prisoner's activity in the exercise of his religion, and specially so where the adherents of one faith are more heavily restricted than the adherents of another. 382 F.2d at 521.

Proof which would be more than adequate support for administrative decision in most fields does not necessarily suffice when we are dealing with the constitutional guaranty of freedom of religion, and with an exercise of religion so widely considered essential as worship services. 382 F.2d at 522.

■ Thus, the Seventh Circuit has not yet adopted a definitive analysis for this court to follow in determining when a prisoner's religious rights have been violated. This court, being mindful that First Amendment rights have a "preferred" status, *Marsh v. State of Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), has determined that the following analysis should apply in this case. First, the plaintiff must demonstrate that a legitimate religious practice is being unduly limited by prison regulations. Second, the burden of proof shifts to the government to show that the inference arises from a compelling state interest in prison security, discipline or administration and that it is among the least restrictive means reasonably available to prison officials.[1] *Barnett v. Rodgers, supra; See* Comment, *Prisoners' Rights : Restrictions on Religious Practices,* 42 U.Colo. L.Rev. 387 (1970).

■ The plaintiff contends that he was punished for his refusal to follow an order to handle pork. The plaintiff has testified

---

1. While this court is applying basically the same First Amendment analysis to the prison setting as it does to situations outside prison walls, *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), it must be noted that differences do exist. In prison cases, prison security, discipline and efficient administration are, by definition, compelling state interests. Further, while the stringent First Amendment test requires any necessary infringement to be the "least restrictive alternative," *Sherbert v. Verner, su-* pra, it would be improper for the courts to apply such a fine-line test to decisions made by prison administrators who have both the responsibility and expertise to determine how best to maintain prison discipline and security. *See Cooper v. Pate,* 382 F.2d 518 (7th Cir. 1967). Therefore, any infringement of a prisoner's First Amendment right arising from the state's interest in prison security, discipline or administration need only be among the least restrictive alternatives reasonably available to prison officials.

that the handling of pork is forbidden by his Islamic religion and that Elijah Muhammed taught Black Muslims not to touch pork. The government has made much of the fact that the Islamic Bible, the Holy Koran, expressly forbids only the eating of pork and that one of the teachings upon which the plaintiff relies in his refusal to touch pork is the book *How Ye to Live* which was not published until 1972.

> To be protected, a particular form of religious expression need not be mandated by one's religion or even endorsed by a majority of its adherents, so long as it is an expression of a sincere, religiously based, conviction.

*Masjid Muhammad—D. C. C. v. Keve, supra.* This court concludes that the plaintiff's refusal to handle pork was an expression of a sincere, religiously based, conviction and qualifies as a legitimate religious practice.

The government has failed to sustain its burden of proving the requisite state interest in prison security, discipline or administration. The testimony has revealed no threat to prison security. In fact, the evidence has shown that the plaintiff completed his work detail after the pork had been removed by another prisoner and returned to kitchen detail with a different work assignment the following two days without incident. His disciplinary report revealed that Chapman "had a good attitude." Chapman's refusal to handle the pork created no substantial interference with prison administration. Of the approximately 500 prisoners at Marion in 1972–73, only some 20 were Black Muslims. It is a fair inference that not all Black Muslims worked in the kitchen. It placed no financial burden on the prison to switch the plaintiff's work assignment, and there was certainly minimal, if any, effect on administrative efficiency. In *Barnett v. Rodgers, supra*, the court described the plaintiffs' request for one pork-free meal a day as:

> essentially a plea for a modest degree of official deference to their religious obligations. Certainly if this concession is feasible from the standpoint of prison management, it represents the bare minimum that jail authorities, with or without specific request, are constitutionally required to do, not only for Muslims but indeed for any group of inmates with religious restrictions on diet.

410 F.2d at 1001.

Assigning Chapman to a work detail in which he did not have to handle pork is substantially less burdensome to prison officials than the preparation of a pork-free meal in *Barnett*. This court concludes that the plaintiff's First Amendment right to free exercise of religion was violated by his punishment for refusal to follow an order to handle pork. The report of the incident and the disciplinary action taken against the plaintiff should be expunged from his records, and an injunction shall issue forbidding further use of such record.

*EIGHTH AMENDMENT ISSUE*

While *Chapman II* directed this court to determine when Chapman's period of segregation became disproportionate to his offense, without giving consideration to the threatening remark made by Chapman to Brown, the prison guard, 586 F.2d at 28, n.4, *but cf. Wolff v. McDonnell*, 418 U.S. 539, 573, 94 S.Ct. 2963, 2983, 41 L.Ed.2d 935 (1974) and *Chapman I*, 507 F.2d at 1252, it now appears that recent developments in the law may further prolong this already protracted litigation. Subsequent to the issuance of the mandate in *Chapman II*, and following the third evidentiary hearing in this court, and while the matter was under consideration, the United States Supreme Court issued its decision in *Rummel v. Estelle [Texas Department of Corrections]* —— U.S. ——, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). That decision dealing with disproportionality of offense and period of imprisonment collides with the mandate of *Chapman II* and requires a total reconsideration of the Eighth Amendment issue in this case.

The Supreme Court in *Rummel* held that the sentence of life imprisonment imposed upon a petitioner who was convicted of his third felony, obtaining $120.75 by false pretenses, did not constitute cruel and unusual

punishment under the Eighth and Fourteenth Amendments. The petitioner, who had been convicted in the Texas courts of two prior non-violent felonies (fraudulent use of a credit card to obtain $80 worth of goods or services and passing a forged check for $28.36), was sentenced to a mandatory life term under the Texas recidivist statute. He sought a writ of habeas corpus claiming that his life sentence was so disproportionate to the crimes he had committed as to violate the cruel and unusual punishment prohibition of the Eighth Amendment.

In denying Rummel's petition, the Supreme Court distinguished cases involving capital punishment:

> Because a sentence of death differs in kind from any sentence of imprisonment, no matter how long, our decisions applying to prohibition of cruel and unusual punishments to capital cases are of limited assistance in deciding the constitutionality of the punishment meted out to Rummel.

—— U.S. at ——, 100 S.Ct. at 1138.

The court also limited the application of *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), a case arising in the Philippine Islands in which the Court held the punishment of *cadena temporal* to be disproportionate to the offense of falsifying a public record. *Cadena temporal* involved "confinement in a penal institution for twelve years and one day, a chain at the ankle and wrist of the offender, hard and painful labor, no assistance from friend or relative, no marital authority or parental rights or rights of property, no participation even in the family council." —— U.S. at ——, 100 S.Ct. at 1138–39. Even after confinement, the prisoner "goes from them to a perpetual limitation of his liberty." *Id.*

The Supreme Court stated:

> Given the unique nature of the punishments considered in *Weems* and in the death-penalty cases, one could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms

of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative. Only six years after *Weems,* for example, Mr. Justice Holmes wrote for a unanimous Court in brushing aside a proportionality challenge to concurrent sentences of five years imprisonment and cumulative fines of $1,000 on each of seven counts of mail fraud. See *Badders v. United States,* 240 U.S. 391 [36 S.Ct. 367, 60 L.Ed. 706] (1916). According to the Court, there was simply "no ground for declaring the punishment unconstitutional." *Id.,* at 394 [36 S.Ct., at 368].

Such reluctance to review legislatively mandated terms of imprisonment is implicit in our more recent decisions as well. As was noted by Mr. Justice WHITE, writing for the plurality in *Coker v. Georgia, supra* [433 U.S. 584] at 592 [97 S.Ct. 2861 at 2866, 53 L.Ed.2d 982], our Court's "Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices; judgments should be informed by objective factors to the maximum possible extent." Since *Coker* involved the imposition of capital punishment for the rape of an adult female, this Court could draw a "bright line" between the punishment of death and the various other permutations and commutations of punishments short of that ultimate sanction. For the reasons stated by Mr. Justice STEWART in *Furman, ante* [408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346], this line was considerably clearer than would be any constitutional distinction between one term of years and a shorter or longer term of years.

Similarly, in *Weems* the Court could differentiate in an objective fashion between the highly unusual *cadena temporal* and more traditional forms of imprisonment imposed under the Anglo-Saxon system. But a more extensive intrusion into the basic line-drawing process that is pre-eminently the province of the legislature when it makes an act criminal would

be difficult to square with the view expressed in *Coker* that the Court's Eighth Amendment judgments would neither be nor appear to be merely the subjective views of individual Justices.

This court reads *Rummel* as disapproving the application of disproportionality tests in cases arising under the Eighth Amendment except in capital or other factually unique cases. As the court found in *Rummel*, the judiciary is ill equipped to make any kind of objective constitutional distinction between one term of years and a shorter or longer sentence.

The Supreme Court's rationale is equally applicable in the context of prisons. This court lacks expertise in prison administration and any judgment it can make as to the disproportionality of giving a prisoner a certain term in segregation for infraction of disciplinary regulations can only be the most blatant exercise of subjectivity on the part of the court.

At the January 25, 1980, hearing in this court, prison officials testified that segregation is not for punishment purposes. Its purpose, according to the testimony, is to help protect the rights of other inmates, help operate the institution in an orderly fashion, and help protect the individual in control. It is precisely these auxiliary interests which, under the rationale of *Rummel*, should be left largely within the discretion of prison disciplinary officials and administrative regulations.

In *Rummel*, the Supreme Court discussed the purpose of the recidivist statute there in question:

Its primary goals are to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time. This segregation and its duration are based not merely on that person's most recent offense but also on the propensities he has demonstrated over a period of time during which he has been convicted of and sentenced for other crimes. Like the line dividing felony theft from petty larceny, the point at which a recidivist will be deemed to have demonstrated the necessary propensities and the amount of time that the recidivist will be isolated from society are matters largely within the discretion of the punishing jurisdiction.

By analogy, these are the same concerns which apply in the context of prison discipline.

In light of *Rummel*, this court holds that Chapman's length of stay in segregation did not work a violation of his rights under the Eighth Amendment to be free from cruel and unusual punishment.

IT IS THEREFORE ORDERED AND ADJUDGED that any report of the incident of October 9, 1972, at Marion Federal Penitentiary in which the plaintiff refused to handle pork and the resulting disciplinary proceedings and confinement to segregation be expunged from the plaintiff's record in the Bureau of Prisons.

IT IS FURTHER ORDERED that the defendants and each of them be, and they hereby are, enjoined from any further reference to or use of the subjects expunged from the plaintiff's records.

IT IS FURTHER ORDERED that the plaintiff take nothing and the defendants go hence without day.