**UNITED STATES of America,**
**Plaintiff,**

v.

**Meir KAHANE, Defendant.**

**Meir KAHANE, Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

Nos. 71–CR–479, 75–C–624.

United States District Court,
E. D. New York.

May 7, 1975.

David G. Trager, U. S. Atty., Eastern District of N. Y., Brooklyn, N. Y., for the United States; Thomas R. Pattison, Edward R. Korman, of counsel.

Barry Ivan Slotnick, New York City, for Meir Kahane.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

The defendant, an ordained orthodox rabbi sentenced to imprisonment by this court, seeks food meeting orthodox Jewish dietary requirements (kosher food). The government contends that this court has no power to consider his claim. For the reasons stated below the court holds that it has the power and obligation to require the government to permit this defendant to obtain such food while he is incarcerated.

### I. HISTORY OF LITIGATION; INTRODUCTION

In 1971 the defendant pleaded guilty to attempting to make a bomb. There was no proof that his activities had directly led to any physical damage but there was reason to believe that his rhetoric and encouragement had led others to engage in violence and that these activities by others may have led to death and to destruction of property.

In view of the factual ambiguity, the defendant's good background as a teacher, father and husband, his lack of any substantial criminal record, the fact that he appeared to be motivated by consideration of the welfare of others rather than self, and the recommendations of authorities that probation be utilized in such circumstances, the court sentenced the defendant to five years probation. A.B.A. Project on Standards for Criminal Justice, Standards Relating to Sentencing Procedures, Standard 2.3(c), Commentary at pp. 72–73 (Approved Draft 1968); A.L.I. Model Penal Code § 7.01. As one of the conditions of acceptance of a guilty plea and probation, the defendant's associates were compelled to turn over to the police stores of secreted explosives.

At the time of sentencing the defendant was warned not to become involved with guns or explosives. He was told: "In this country, at this time, it is not permissible to substitute the bomb for the book as the symbol of Jewish manhood." Shortly thereafter he was found in the company of people with rifles who were urging others to obtain arms. He was then informed in more detail that he was to have nothing to do, directly or indirectly, with weapons. It was made explicit and clear that this prohibition applied throughout the world and, more particularly, in the State of Israel. The defendant then left with his family to settle in Israel.

Following the murder of members of the Israeli Olympic Team in Germany and attacks on Jewish settlements by Palestinian guerillas, the defendant again engaged in prohibited activities. The evidence shows that he attempted to smuggle weapons out of Israel into this country and that he engaged in Israel in an attempt to induce others to bomb foreign embassies here and elsewhere. Just as his activities had been aborted in this country by vigilant police work at the national and local levels, so the Israeli police discovered his plans in time. He was held in prison in Israel, convicted and released.

Thereupon, he returned to this country where he was prosecuted for violation of probation. After a full hearing he admitted his guilt. Extensive pleas for mercy were made on the ground that the defendant was motivated by a desire to help others in the Soviet Union and elsewhere. This court rejected those pleas. It noted that, "were it to fail to punish . . ., the probation system could not effectively continue. . . . [N]o system of justice in a democracy can exist if violence is not condemned, no matter who the victim, no matter what the motive and no matter who the actor."

Since his term of probation had approximately one year to run, defendant was sentenced to one year in prison. 18 U.S.C. § 3653. With no objection by the government, the court ordered:

"He is to be placed in an institution, and in a setting so that he can obtain . . . kosher foods and [comply with] other religious requirements that he may reasonably have."

Before service of sentence begins, it is the normal practice of the court, whenever possible, to allow a defendant to arrange his affairs or to celebrate imminent holidays, such as Christmas, with his family. In this case, since the defendant's family resided in Israel, it was not possible for him to be with it during Passover, which was about to begin. Accordingly, with the concurrence of the government, he was remanded to the Federal Community Treatment Center in New York City during Passover, with instructions that he be permitted to buy his own food in local establishments and to participate in required religious services. As the Passover period came to a close and the defendant was about to be transferred to a prison, the defendant informed the court that the government planned to deny him kosher food. The government conceded that, under its long-standing practice, this was its intention.

Pending decision of defendant's motion that such food be provided, the defendant was ordered kept at the Community Treatment Center. He was to be permitted to purchase kosher food at his own expense in a local restaurant and to engage in required communal prayers in a nearby synagogue. At other times he was to be kept at the Center under normal conditions of incarceration as fixed by the correction authorities.

The government contests the court's jurisdiction to consider whether the defendant is entitled to kosher food. It also argues that the court should not decide the issue because it would be burdensome to meet the religious dietary needs of its diverse prison population.

A person does not lose his basic humanity and constitutional rights because he has been convicted or is serving a term in prison. In this respect we differ fundamentally from some governments which consider its citizens' rights forfeited upon incarceration and engage in abuses of prisoners that amount to a form of slavery. Our courts have made it clear that, to the extent consonant with effective administration of correctional institutions, the First Amendment rights of prisoners cannot be ignored:

"[A] policy of judicial restraint [concerning prison administration] cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights."

Procunier v. Martinez, 416 U.S. 396, 405–406, 94 S.Ct. 1800, 1807–08, 40 L. Ed.2d 224 (1974). *See also* Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) ("Federal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons,' including prisoners."); Wilson v. Beame, 380 F.Supp. 1232, 1242 (E.D. N.Y.1974) ("the Constitution requires the broadest tolerance of religiously based activity and requires public officials to take care to avoid inhibiting any thoughts and deeds reasonably characterized as religious.").

## II. TESTIMONY AND AUTHORITIES ON IMPORTANCE OF KOSHER FOOD

### A. Testimony

At the hearing, the main witness was Rabbi Moishe D. Tendler, an ordained Orthodox Rabbi, a senior member of the State Advisory Board on Kashruth to the New York State Department of Agriculture and Markets, a member of the Advisory Board on Kashruth of the Rabbinic Council of America, and a Professor teaching both Talmudic law and biology at Yeshiva University. Rabbi Tendler testified that dietary laws (kashruth) are central to the religious observances of orthodox Judaism and that an orthodox Jew must be "in extremis" before violating these laws:

"If all [an orthodox Jew] had was non-kosher food to eat, he would have to wait until his physiological state— his vital signs would be so determined

by competent medical authorities that he is in danger of dying—then and only then could he partake of food [according to Biblical and Rabbinic law].

. . . . . .

"Up until forfeiture of life, man must forfeit everything he has, company of his wife and children, his entire wealth, to enter into the realm of the most poverty-stricken rather than transgress the Kashruth laws.

"He is to allow himself to be subjected to torture, to physical torture, to mutilation rather than consume [non-kosher] food.

"I hope that impresses the Court with the fact that we are not dealing with a frivolous notion. It is not a question of a special dietary requirement of white wine with fish or red wine with beef. We are talking about a critical need of the Jew to relate with his God in a series of instructions that have been our mark of distinction from the days that we left Egypt so many thousands of years ago.

. . . . . .

"At no time is he exempted, from the day he is born . . . until the day he dies . . . he is governed by Jewish law."

His testimony was confirmed by three other rabbis at the hearing and by a letter, admitted without objection, from Rabbi Moshe Feinstein, a renowned expert on Talmudic law. This evidence was not contested by the government.

A number of rabbis testified that they had personal knowledge of the defendant's religious practices. They knew him to be a meticulous observer of all the tenets of Biblical and Rabbinic law, including kashruth. The government did not dispute this testimony.

Rabbi Henry Siegman, Vice-President of the Synagogue Council of America, testified that his organization, which has assisted the Federal Bureau of Prisons for the past fifteen years in providing Jewish chaplains, regularly requested that the Bureau provide kosher food to Jewish prisoners, but had been unsuccessful. He, and other witnesses testified, without contradiction, that kosher food could be provided, using modern technology, with no inconvenience to a large institution serving meals to a predominantly non-observant population. They gave detailed descriptions of how this could be accomplished using the regular kitchen equipment of the institution with no appreciable administrative difficulties.

Louis Gengler, Warden of the Federal Detention Headquarters at West Street, testified that one prisoner in his institution had received frozen kosher meals as an "experiment" through arrangements made and paid for by the government; no difficulty was encountered. He agreed that these dinners could be stored and prepared with minimal inconvenience. He further stated that another defendant, while incarcerated at West Street, had been assigned to the prison's Food Service unit and provided, out of regular prison supplies and through his commissary account, with supplemental foods meeting kosher requirements, including hard-boiled eggs, some cheeses, tinned-fish and fruits. The Warden also testified that the prison provides Jewish inmates with a kosher meal on Passover and other Jewish holidays. He admitted that a recent attempt by several rabbis to provide the prison with frozen kosher dinners for observant incarcerated Jews, without expense to the government, was refused in accordance with a policy not to provide kosher food regularly or to accept it from others.

With the consent of counsel, the court took judicial notice of the papers filed and testimony given in a case that has been pending in the Southern District of New York, United States v. Huss, 394 F.Supp. 752 (S.D.N.Y.1975). Although the factual background is distinguishable, that case also presents the issue of whether inmates are entitled to food that meets orthodox Jewish requirements and is comparable in nutritional

content to the menu served to other federal prisoners. The *government*, in *Huss*, stated the practice of the Federal Bureau of Prisons in the following terms:

"[W]hile in exceptional cases Kosher food has been made available, it is the policy of the Bureau that such food is not to be made available to the inmates on a routine basis. It has been the Bureau's decision that administrative, financial, disciplinary, and security problems which would be created by the offering of such food so far outweigh the incidental burdens upon the practice of the inmates' various religions as to preclude attempting to accommodate the dietary needs of the diverse groups within the prison population."

It is the government's position that this posture is consistent with the official Bureau of Prisons policy requiring its personnel

"to extend to committed offenders the greatest amount of freedom of, and opportunity for pursuing, individual religious beliefs and practices as is consonant with the Bureau of Prisons mission—the correction of the committed offender. This must be accomplished within the context of the requirement of maintaining security, safety, and orderly conditions in the institutions."

Bureau of Prisons Policy Statement 7300.43A (July 7, 1970).

Testimony in the *Huss* case by prison officials indicated that the average cost of kosher meals would be somewhat higher than that for an average prison meal. An attorney, however, estimated that only six to twelve inmates in the entire federal prison system would seek kosher food if it were available; this contention was not challenged.

It is possible to summarize this testimony as follows: (1) dietary laws are of critical theological importance to orthodox Judaism; (2) incarceration does not relieve an orthodox Jew of the obligation to obey these religious requirements; (3) defendant observes these practices strictly and would have to be in danger of death through fasting before he could partake of a nonkosher diet; (4) the Bureau of Prisons has refused to, and will refuse to, provide the defendant with food consistent with his orthodox Jewish religious beliefs; and (5) providing foods meeting orthodox Jewish requirements does not create significant administrative difficulties in prisons. This summary constitutes this court's findings of fact based upon evidence adduced at the hearing. Fed.R.Civ.P., Rule 52; Fed.R. Crim.P., Rule 23.

### B. *Judicially Noticed Literature*

Particularly with regard to the importance of dietary requirements, judicially noticed literature supports these findings. *See* Fed.R.Ev., Rule 201.

The concept of "kashruth" (dietary observances) does not involve cleanliness or alimentary needs in any hygienic or nutritional sense. Rather, what is involved is the issue of godliness. Each person observing kashruth is treated as if he were in a direct relationship with God, observing what in other religions might be considered a priestly function at the table in the sequence of preparation and service of food and of prayers. With the final destruction of the Temple and the beginning of the Talmudic period in Babylonia and Palestine, a set of strict regulations developed surrounding the consumption of food analogous to those governing the Temple priests, but to be observed by each Jew in his daily life. *See* J. Neusner, Invitation to the Talmud 14-20 (1973). In a sense, therefore, each meal partaken by a person strictly observing the rule of kashruth is the equivalent of Christianity's sacramental mass, where the implements, wine, and wafer must be prepared with careful consideration for "cleanliness" in a theological sense.

A theological concept central to Judaism, recognized by Jewish and non-Jewish scholars alike, is that of a "cove-

nant" between God and man. The covenantal theme—that God loves his people and will favor them in generations to come and lead them to a promised land, and in return men shall walk in God's way—is repeated again and again in the Genesis stories of Noah, Abraham, Isaac, Jacob, and Joseph. *See* N. Sarna, Understanding Genesis 120–133 (1967). The covenant theme is the essence of stories of the exodus and of Moses, and becomes the crucible of the messages of the Prophets and essential to an understanding of the relation between God and man. *See, e. g.,* G. von Rad, Old Testament Theology 129-135 (D. Stalker trans. 1962). Individual responsibility is not submerged in the covenant with a people. As Sarna notes:

"this biblical 'doctrine of merit,' . . . has profound consequences for man, for it implies that the individual is of supreme importance and that from his actions may flow beneficial consequences for all society."

N. Sarna, *supra,* at 151.

The way in which man's covenantal obligations to God are understood in the Old Testament and in the Talmud and elsewhere is through the concept of law—there are duties men must fulfill to be faithful to God. Particularized laws evolved in a succession of codifying patterns. *See* J. Smith, The Origin and History of Hebrew Law, esp. at 52–53, 127–130 (1960); R. Pfeiffer, The Books of the Old Testament 70–95 (1965). Some scholars have grouped the content of Exodus, chapters 20:23–23:33, 34:17–26, into a "Covenant Code", and Deuteronomy, chapters 12–26, into a "Deuteronomic Code". Smith, *supra,* at 15–69; Pfeiffer, *supra,* at 70–77, 78–83. Similarly, Leviticus, chapters 17–26; Exodus, chapters 31:13–15; and Numbers, chapters 10:10, 15:38–40, have been grouped by some scholars into a "Holiness Code." Smith, *supra,* at 70–92; Pfeiffer, *supra,* at 83–86. It is particularly in this last grouping that many of the biblical sources for kashruth are found. *See, e. g.,* Leviticus, chapters 11, 17, 22:18–30; Deuteronomy, chapters 12:16; 12:23–25, 14; Exodus, chapters 23:19, 34:26

Preclusion of certain foods dates from the symbolic "forbidden fruit" in Genesis, chapter 2:16–17, but, as suggested above, kashruth acquires its central meaning from the covenant relationship. The covenant, as understood in the Bible, implies a relationship between parties of different orders of being (G. von Rad, Old Testament Theology 129 (D. Stalker trans. 1962) ), whereby men obtain harmony with the deity through strict observation of the law, of which the "Holiness Code" is an important aspect. *See* J. Smith, The Origin and History of Hebrew Law 90–92 (1960 ed.). Thus kashruth is deeply symbolic—a symbol made real through the ritual of daily observance—of the basic relationship between God and man.

Compliance with the discipline of kashruth is one of the important ways by which the faithful are reminded of the presence of the significant in the commonplace. *See, e. g.,* M. Kadushin, The Rabbinic Mind 167–170 (3d ed. 1972). And obedience to the law itself is a source, says rabbinic tradition, of holiness. S. Schechter, Aspects of Rabbinic Theology 168, 207–208 (Schocken Books ed. 1972). Compliance with kashruth, writes Schechter, has

"to be considered as so many lessons in discipline, which if only as an education in obedience, result in establishing that communion between man and God which is the crowning reward of holiness." *Id.* at 208.

Kashruth, while deeply rooted in Biblical literature, forms a major part of the rabbinical interpretations in both the Babylonian and Palestinian Talmuds. *See, e. g.,* The Babylonian Talmud, Seder Kodashim, Tractate Hullin, xi (Soncino edition, I. Epstein ed., E. Casdan trans. 1948) ("it is predominantly through the observance of the dietary laws and the abstention from what is unclean that Israel can maintain itself as a holy people."). *See also, e.g.,* The Babylonian

Talmud, Seder Kodashim, Tractate Kerithoth 1, 17–38 (Soncino edition, I. Epstein ed., I. Porusch, trans. 1948) (offenses for which one is to be punished by "kareth"—to be cut off from one's people—include certain dietary laws); *Id.*, Seder Mo'ed., Tractate Bezah (M. Ginsberg, trans. 1938) (limitations under which food must be prepared on festival days); *Id.*, Seder Tohoroth, Tractate Kelim (W. Slotki, trans. 1948) (laws of uncleanness as they affect utensils), Tractate Tohoroth (W. Slotki, trans. 1948)(laws of cleanness concerning foods and liquids and their preparation and consumption), Tractate Ukzin (S. Lehrman, trans. 1948) (cleanness of roots, stalks, and husks of plants). It is likewise a major topic in the Code of Maimonides and the writings of other Jewish scholars. *See* The Code of Maimonides (Mishneh Torah), Book Five, The Book of Holiness, Treatise II, Forbidden Foods (Yale Judaica Series, Rabinowitz and Grossman trans. 1965), Book Ten, The Book of Cleanness, Treatise VI, The Uncleanness of Foodstuffs (Yale Judaica Series, Danby trans. 1954); II Maimonides, The (Negative) Commandments, 172–191, pp. 167–187 (C. B. Cheval trans. 1967). *See also* S. Ganzfried, Code of Jewish Law (Kitzur Shulhan Aruh), vol. I, chapts. 38, 46 (Goldin trans. 1961); G. Horowitz, The Spirit of Jewish Law 115–116 (1953).

As the rabbinic literature makes clear, the dietary laws are to be strictly observed, as part of the Biblical command to "In all thy ways acknowledge Him." Proverbs 3:6. Uncontroverted testimony as well as the literature establish that the dietary laws are to be suspended by the orthodox faithful only when one's life is in danger. *See, e. g.*, S. Ganzfried, Code of Jewish Law, vol. II, chap. 92, vol. IV, chapt. 192 (Goldin trans. 1961); I Maimonides, The Book of Knowledge (Mishnah Torah) 5:6, 40b (M. Hyamson ed. 1965); I. M. Kagan, Machne Yisroel, chapt. 8, 58 (trans. on file by M. Tendler, 1943 ed.) (obedience to dietary laws required of Jewish soldiers in Russian and Polish armies); L.

S. Eckman, Revered By All 39–42 (1974) (National Jewish Welfare Board requires that Jewish members of the American armed forces obey dietary laws, adopting position of Machne Yisroel, *supra*).

An inability to observe the Jewish dietary laws would seem to strike an observant orthodox Jew in a manner similar to the way defilement of communion would strike a devout Catholic. In fact, the great discipline demanded of an observant Jew seems similar in spirit to the orderly and disciplined daily ritual of prayer, meditation, mass, and communal meals of monks in cloisters, although, of course, the former group is immersed in earthly life and the latter separated from it. *See, e. g.*, Pfeiffer, The Books of the Old Testament 60 (1965).

This brief discussion of theological and historical background obviously has some bearing on the issue of defendant's *bona fides*. He appears to be almost possessed with the problems of the Jews as a people. Such a dedicated Jew would fear that his own failure to obey God's commands as to kashruth might constitute a breach of the covenant that might affect the promised land and have grave consequences to himself.

### III. · *THE LAW*

#### A. *Jurisdiction*

1. *Power of Court to Make Recommendations on Conditions of Incarceration*

The government concedes that the court has jurisdiction to make recommendations concerning conditions of incarceration. Such recommendations are routinely sought by the Federal Bureau of Prisons. *See* Bureau of Prisons Form A.O. 235 (11/74). A court's recommendations are generally followed. Thus, the court, at the least, has power to make recommendations to the prison authorities concerning conditions for the defendant's incarceration, including availability of kosher food.

Judges should take their responsibility to make such recommendations seriously. They have a close relationship with, a responsibility for, those they send to prison. They want to ensure that those they sentence are not mistreated or deprived of their dignity and opportunity for rehabilitation. *But cf.* United States v. D'Allesandro, 517 F.2d 429 (2d Cir. 1975) (limited power of *nisi prius* judges to correct abuses by Parole Board of prisoners they have sentenced). Stripping a prisoner of the opportunity to maintain and strengthen his religious and ethical values would be so counterproductive of good sentencing principles as to require reconsideration of incarceration. *See, e. g.,* A.B.A. Project on Standards for Criminal Justice, Standards Relating to Sentencing Alternatives and Procedures 54–55, 61–63 (Approved Draft 1968); Barnett v. Rogers, 410 F.2d 995, 1002 (D.C.Cir. 1969).

2. *28 U.S.C. § 2255.*

A more precise basis for the court's jurisdiction is found in 28 U.S. C. § 2255. The defendant's petition to vacate his sentence, in that it unconstitutionally denies him his First Amendment privilege to limit his diet to kosher food, may properly be considered as a motion under 28 U.S.C. § 2255. That statute permits a federal prisoner to move at any time to vacate or correct his sentence upon the ground "that the sentence was imposed in violation of the Constitution or laws of the United States . . . ." *See* Hill v. United States, 368 U.S. 424, 426–27, 82 S.Ct. 468, 470, 7 L.Ed.2d 417 (1962). The third paragraph of the statute deals with the action to be taken on such a motion:

> "If the court finds . . . that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or . . . *correct the sentence as may appear appropriate.*" (Emphasis supplied.)

Section 2255 was designed to revise the procedure by which federal prisoners seek the relief of habeas corpus. It was intended "to provide in the sentencing court a remedy exactly commensurate with that which had previously been available by habeas corpus in the court of the district where the prisoner was confined." Kaufman v. United States, 394 U.S. 217, 222, 89 S.Ct. 1068, 1071, 22 L.Ed.2d 227 (1969). This court, having sentenced the defendant, may at any time review the sentence it imposed and correct the denial of a constitutional right violated by the imposition of the sentence itself. The statutory right under section 2255 is not merely to a federal forum but to "full and fair consideration of constitutional claims." Kaufman v. United States, *supra*, 394 U.S. at 228, 89 S.Ct. at 1075. *Cf.* S. Fuld, Writ of Error Coram Nobis, 117 N.Y.L.J., Nos. 130–132, June 5, 6, 7 (1947); 28 U.S.C. § 1651, 28 U.S.C. § 2241(c)(3).

Habeas corpus, which section 2255 incorporates, "is not a static concept, but expands and develops as new problems arise." Price v. Johnson, 334 U.S. 266, 282, 68 S.Ct. 1049, 1058, 92 L.Ed. 1356 (1948). It has been utilized in claims involving rights of members of the armed forces seeking release (In re Tarble, 13 Wall. (80 U.S.) 397, 20 L.Ed. 597 (1872); Cox v. Wedemeyer, 192 F.2d 920 (9th Cir. 1951)); concerning child custody (Ex parte Beaver, 271 F. 493 (6th Cir. 1921)); concerning rights of aliens detained by authorities or a carrier (Chin Yow v. United States, 208 U. S. 8, 28 S.Ct. 201, 52 L.Ed. 369 (1908); United States ex rel. Boulbol v. Fielding, 175 F. 290 (2nd Cir. 1909)); and concerning rights of mental patients (Dorsey v. Gill, 80 U.S.App.D.C. 9, 148 F. 2d 857, *cert. denied,* 325 U.S. 890, 65 S. Ct. 1580, 89 L.Ed. 2003 (1945); De Marcos v. Overholser, 78 U.S.App.D.C. 131, 137 F.2d 698, *cert. denied,* 320 U.S. 785, 64 S.Ct. 157, 88 L.Ed. 472, *reh. denied,* 320 U.S. 813, 64 S.Ct. 204, 88 L.

Ed. 491 (1943); Shields v. Shields, 26 F.Supp. 211 (D.C.Mo.1939)). The Supreme Court has spoken of it in the following terms:

> "[I]t is a legislatively approved source of procedural instruments designed to achieve 'the rational ends of the law.' . . .

> We accordingly look to the usages and principles which have attached themselves to the writ of *habeas corpus* down through the years to the present time. The historic and great usage of the writ, regardless of its particular form, is to produce the body of a person before a court for whatever purpose might be essential to the proper disposition of a cause. The most important result of such usage has been to afford a swift and imperative remedy in all cases of illegal restraint upon personal liberty. . . .

> Moreover, the principle has developed that the writ of *habeas corpus* should be left sufficiently elastic so that a court may, in the exercise of its proper jurisdiction, deal effectively with any and all forms of illegal restraint. The rigidity which is appropriate to ordinary jurisdictional doctrines has not been applied to this writ. . . . Justice may on occasion require the use of a variation or a modification of an established writ."

Price v. Johnson, 334 U.S. 266, 282–284, 68 S.Ct. 1049, 1058–1059, 92 L.Ed. 1356 (1948).

■ Section 2255 can be used only to attack the denial of constitutional rights at the *imposition* of a sentence, not those which arise afterwards upon its *execution*. The latter class of violations must be rectified by a habeas corpus or other form of petition in the district of confinement. Mordecai v. United States, 137 U.S.App.D.C. 198, 421 F.2d 1133, 1139–40 (1969) *cert. denied*, 397 U.S. 977, 90 S.Ct. 1098, 25 L.Ed.2d 272 (1970); McCune v. United States, 374 F. Supp. 946 (S.D.N.Y.1974). An example of the kind of case where venue would lie in the district where the prison is located is a denial of First Amendment mailing privileges by the incarcerating institution. Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

The defendant's application falls within the scope of section 2255 because it was obvious to the sentencing court at the time of sentencing that defendant's dietary requirements, if ignored, would create a serious constitutional issue. The government has conceded that no federal prison will provide defendant with kosher food. Thus the imposition of the sentence, if the defendant would be deprived of his First (religious) or Eighth ("cruel and unusual" punishment) Amendment rights, would be unconstitutional.

■ It is not necessary to go through the formality of transporting the defendant to the prison where he will be deprived of a protected right if it is clear from the time of imposition of sentence that he will be deprived of that right. The Constitution does not require litigants to subject themselves to possible irreparable harm before seeking relief from an allegedly unconstitutional practice. *See, e. g.,* Pierce v. Society of Sisters, 268 U.S. 510, 536, 45 S.Ct. 571, 574, 69 L.Ed. 1070 (1925) ("Prevention of impending injury by unlawful action is a well-recognized function of courts of equity").

■ Under section 2255 the sentencing court must determine whether a hearing is required. Mirra v. United States, 379 F.2d 782 (2d Cir.), *cert. denied,* 389 U.S. 1022, 88 S.Ct. 593, 19 L. Ed.2d 667 (1967). Because the petitioner raised a material issue of fact on a claim of constitutional dimensions respecting the conditions of his sentence, he was entitled to an evidentiary hearing before the sentencing court. United States v. Carlino, 400 F.2d 56 (2d Cir.), *cert. denied,* 394 U.S. 1013, 89 S.Ct. 1630, 23 L.Ed.2d 39 (1968); United States v. Tribote, 297 F.2d 598 (2d Cir. 1961).

Effective judicial administration supports the conclusion that defendant's claims should be heard by the sentencing court. As will be noted below, an important issue of fact is whether the application is made in good faith. Since this court has had the defendant before it on many occasions and is familiar with the presentence report, the decision on dietary needs can be made more readily here than in any other court.

### 3. *28 U.S.C. § 1361*

■ Jurisdiction also lies pursuant to 28 U.S.C. § 1361 granting "district courts jurisdiction of any action in the nature of mandamus to compel an officer . . . of the United States to perform a duty." *See* Cortright v. Resor, 447 F.2d 245, 250–251 (2d Cir. 1971), *cert. denied sub nom.* Cortright v. Froehlke, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972).

■ Defendant's case, for purposes of section 1361, is "ripe," since the harm threatened is both imminent and irreparable. *See* Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Thus there is no need to wait until the defendant approaches death through starvation in whatever institution the government places him.

■ Venue is proper under section 1361 since defendant is currently under this court's jurisdiction and control and "the cause of action arose" in this district and because the defendant resided in this district before incarceration. 28 U.S.C. § 1391(e). *Cf.* Ott v. United States Board of Parole, 324 F. Supp. 1034, 1037 (W.D.Mo.1971) (for venue purposes of section 1391, a prisoner "resides" in the district of his domicile previous to incarceration—which in the instant case is Brooklyn). In any event, no objection to venue, but only to jurisdiction, has been made. *See* 28 U. S.C. § 1406(b).

Defendant is being held in a Community Treatment Center in Manhattan, across the river from this courthouse, because the Eastern District holds no comparable federal institution. It would be absurd to suggest that because of this accident of institutional location a Southern District Court, unfamiliar with this defendant, had to decide the case. The court would be doing a disservice to another member of the federal bench if it allowed the jurisdictional objection raised by the government to enable it to foist the difficulties presented by this defendant off onto another judge. Cf. 28 U.S.C. § 1404. See also, 28 U.S.C. § 1653.

### 4. *Federal Rules of Criminal Procedure, Rule 35*

The defendant also contends that the court has jurisdiction to evaluate his claim of a right to kosher food because of Rule 35, permitting the sentencing court to modify a sentence. *See* Fed.R. Crim.P. 35. Rule 35 allows a court to reduce a sentence or correct an illegal sentence within 120 days of sentencing.

The government argues, however, that Rule 35 was not intended to apply to sentences imposed for a violation of probation pursuant to 18 U.S.C. § 3653, which provides, in part, that "the court may revoke the probation and require [the probationer] to serve the sentence imposed, or any lesser sentence . . . ." The government reasons that the last sentence of Rule 35 ("The court may also reduce a sentence upon revocation of probation as provided by law") suggests that the reduction of a sentence pursuant to section 3653 amounts to a Rule 35 motion, and no further such motions may be heard if 120 days has run from the original date probation was imposed. This interpretation would prevent the court from reducing inappropriate probation violation sentences via Rule 35, depriving the courts and defendants of an important remedial tool. The court, however, need not decide this issue since there are other bases of jurisdiction.

The fact, as the government suggests, that the defendant may have abused his privileges in the Community Treatment Center by utilizing some of the time set

aside for prayer or meals for secular purposes is not dispositive of the serious constitutional issues this court must consider. No ruling is required on whether these claims, if supported, may bear on the administrative determinations made by the Bureau of Prisons in controlling the defendant during his term of incarceration.

■ The government is entitled to make some effort to determine the sincerity of religious beliefs where obligations and rights flow from that determination. Greenawalt, Book Review, Konvitz, Religious Liberty and Conscience: A Constitutional Inquiry, 70 Colum.L. Rev. 1133, 1135–1136 (1970). But such inquiry must proceed cautiously since the state should generally avoid placing itself in the position of deciding which religious claims are meritorious. *See* United States v. Ballard, 322 U.S. 78, 86–87, 92–95, 64 S.Ct. 882, 886–887, 889–890, 88 L.Ed. 1148 (1944); M. Konvitz, Religious Liberty and Conscience: A Constitutional Inquiry 27–50 (1968).

B. *Constitutional Requirements*

1. *General Framework*

■ Prisons are located at a unique area of tension between the establishment clause and the free exercise clause of the First Amendment. The state, through the establishment clause, cannot require persons to worship in particular ways and cannot aid, endorse, or promote particular religions. School District of Abington, Pennsylvania v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). But where the government has total control over people's lives, as in prisons, a niche has necessarily been carved into the establishment clause to require the government to afford opportunities for worship. The free exercise clause embraces both the freedom to believe and the freedom to act according to those beliefs. Cantwell v. Connecticut,

310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The government, in its control of prisons, is precluded from denying religious observance to inmates. Its obligation to permit religious observances is an extension of the position that no one can be burdened or punished by the state for having the "wrong" religious beliefs. Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) (public positions cannot be withheld from persons because of their religious beliefs). Thus, in the prison setting the establishment clause has been interpreted in the light of the affirmative demands of the free exercise clause.

The basic constitutional framework for cases concerning governmental regulatory infringement on religious practices was reviewed in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L. Ed.2d 965 (1963). There the court dealt with a state's denial of unemployment benefits to a Seventh Day Adventist who refused to work, due to religious precepts, on Saturdays. The court found that:

"The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious beliefs as such."

374 U.S. at 402, 83 S.Ct. at 1793. It relied upon a consistent rejection of

"challenges under the Free Exercise Clause to governmental regulation of certain overt acts prompted by religious beliefs or principles, for 'even when the action is in accord with one's religious convictions, [it] is not totally free from legislative restrictions.' Braunfeld v. Brown, 366 U.S. 599, 603, 81 S.Ct. 1144, 1146, 6 L.Ed. 2d 563. The conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order."

374 U.S. at 403, 83 S.Ct. at 1793. The court concluded that a "compelling state interest" must justify any "substantial infringement of [the] appellant's First Amendment right," (374 U.S. at 406, 83 S.Ct. at 1795), and that, as noted above,

the traditional measure for that interest required a substantial threat to public safety, peace, or order. It further commented that the compelling interest test would be met only if the religious practice created an *"administrative problem of such magnitude"* that it rendered proper statutory regulation unworkable. 374 U.S. at 409, 83 S.Ct. at 1796. (Emphasis added.)

This essential "compelling state interest" formula has been repeatedly confirmed. In Braunfeld v. Brown, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed. 2d 563 (1961), the court declared:

"If the purpose or effect of a law is to impede the observance of one or all religions . . . that law is constitutionally invalid even though the burden [on the free exercise of religion] may be characterized as being only indirect."

In Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945), the court emphasized that, "[o]nly the gravest abuses endangering paramount interests, give occasion for permissible limitation" on First Amendment rights.

These broad principles apply to the religious rights of prisoners:

"The state may restrict religious acts if it can be shown that they pose 'some substantial threat to public safety, peace or order,' and that there is a 'compelling state interest in the . . . regulation.' . . . [P]laintiff's desire to practice his religion may be restricted only upon a convincing showing that paramount state interests so require."

Brown v. Peyton, 437 F.2d 1228, 1231 (4th Cir. 1971) (rights of Black Muslim prisoner). *See generally* Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Pierce v. LaVallee, 293 F. 2d 233 (2d Cir. 1961); Sewell v. Pegelow, 291 F.2d 196 (4th Cir. 1961).

Such cases must, of course, be read against the Supreme Court's acknowledgement that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights." Price v. Johnson, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). *See also* Sostre v. McGinnis, 334 F.2d 906, 908 (2d Cir. 1964). Yet, the Supreme Court has also held that First Amendment rights may be curtailed only by the least drastic means. United States v. Robel, 389 U.S. 258, 268, 88 S.Ct. 419, 426, 19 L.Ed.2d 508, 516 (1967); Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed. 2d 231, 237 (1960); Note, Less Drastic Means and the First Amendment, 78 Yale L.J. 464 (1969).

In addition to these First Amendment grounds, the Supreme Court has held that the Fourteenth Amendment precludes prison authorities from indirectly and unreasonably disfavoring practices of some religions by preventing its adherents from observing their religious requirements. *See, e. g.*, Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (Buddhist prisoner must be allowed an opportunity to practice his religious faith comparable to opportunities allowed to prisoners of other faiths).

This approach is reflected in cases requiring prisons to contract to provide clergy of various faiths, a comparatively substantial administrative burden. *See* Cruz v. Beto, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972) (while clergy need not be provided to every sect "regardless of size", comparable opportunities for religious practices must be offered); Northern v. Nelson, 315 F.Supp. 687 (N.D.Cal.1970), *aff'd*, 448 F.2d 1266 (9th Cir. 1971) (prison that provides Protestant, Catholic, and Jewish clergy must provide Muslim minister on similar contractual basis); Kauffman v. Johnston, 454 F.2d 264 (3d Cir. 1972) (prison made effort to secure the services of a Jewish rabbi for Jewish prisoners); Long v. Parker, 390 F.2d 816 (3d Cir. 1968) (case remanded to determine whether prison's

failure to provide Muslim minister constituted discrimination when other faiths were provided clergy).

█ In sum, the "compelling state interest" standard must be applied to provision of kosher food to Jewish prisoners in federal institutions. Failure to make such food available would be permissible only if providing it created a seriously disruptive administrative burden.

### 2. Cases on Rights of Jewish Prisoners

While we have found no cases deciding whether prison officials are compelled to provide kosher food to Jewish prisoners, there are peripheral decisions consistent with the general principles just discussed. For example, in Ho Ah Kow v. Nunan, 12 Fed.Cas. 252 (No. 6,546) (Cal.C.C.1879), Justice Field, acting as Circuit Justice, found that a prison requirement that discriminated in effect against Chinese prisoners by requiring them to cut their queues was invalid as a "cruel and unusual punishment" and a discrimination in violation of the Fourteenth Amendment. In dicta, the court stated that a regulation forcing Jewish prisoners to eat pork would be "an offense against their religion," and under certain circumstances would be an invalid "special law," illegally discriminatory "in effect and operation." 12 Fed.Cas. at 255.

Where a prison official failed to permit a Jewish inmate to attend religious services when he was confined in a close control unit, the court ordered the prison to provide special escorts and make such services available in view of the high importance the law places on the right to worship. Konigsberg v. Ciccone, 285 F.Supp. 585 (D.C.Mo.1968), aff'd, 417 F.2d 161 (8th Cir.), cert. denied, 397 U.S. 963, 90 S.Ct. 996, 25 L. Ed.2d 255 (1970). See also Wilson v. Beame, 380 F.Supp. 1232 (E.D.N.Y. 1974) (Constitution mandates that prisoners in segregation have access to communal religious worship, including a minyan (of ten Jewish adult males)

where available). In Rockey v. Krueger, 62 Misc.2d 135, 306 N.Y.S.2d 359 (Sup. Ct., Nassau Co.1969), the court noted that since orthodox Jewish prisoners were not required to shave beards on religious grounds, a Muslim prisoner would not be so required.

The Third Circuit came close to dealing with the issue of availability of kosher food in 1972. in Kauffman v. Johnston, 454 F.2d 267 (3d Cir. 1972) a Jewish prisoner sought kosher food for the celebration of Passover, but since the holiday had passed, the court declared the case moot. In a related case, Kauffman v. Johnston, 454 F.2d 264 (3d Cir. 1972), the court remanded to the district court a complaint by the same prisoner who sought an opportunity to observe Jewish religious holidays and to worship because the plaintiff "stated a cause of action cognizable under the Civil Rights Act." 454 F.2d at 266. The court noted that the Jewish Welfare Board in Wilkes-Barre, Pa., some twenty miles from the Pennsylvania State Prison, provided kosher food for Jewish inmates through arrangement with the prison.

### 3. Cases on Muslim Dietary Requirements

The line of cases closest to the one before us concerns availability of pork-free foods to Black Muslim prisoners. The leading discussion is Barnett v. Rogers, 410 F.2d 995 (D.C.Cir. 1969). The issue was whether officials of the district jail were constitutionally compelled to accommodate the dietary laws of the Muslim faith. In discussing the evaluative standard to be applied, the court protected the religious dietary requirements of the prisoners. It stated:

> "To say that religious freedom may undergo modification in a prison environment is not to say that it can be suppressed or ignored without adequate reason. And although 'within the prison society as well as without, the practice of religious beliefs is subject to reasonable regulations, necessary for the protection and welfare of the community involved,' [Tony v.

Parker, 390 F.2d 816, 820 (3d Cir. 1968)] the mere fact that government, as a practical matter, stands a better chance of justifying a curtailment of fundamental liberties where prisoners are involved does not eliminate the need for reasons imperatively justifying the particular retraction of rights challenged at bar. Nor does it lessen governmental responsibility to reduce the resulting impact upon those rights to the fullest extent consistent with the justified objective."

410 F.2d at 1000–1001.

The court noted in *Barnett* "[t]hat penal as well as judicial authorities respond to constitutional duties is vastly important to society as well as the prisoner." 410 F.2d at 1002. The case was remanded and the district court was ordered to inquire "whether the governmental purposes and operations responsible for [the dietary] impediments could feasibly be 'pursued by means that [less] broadly stifle fundamental personal liberties.'" 410 F.2d at 1003. It suggested various administrative procedures that could be followed to protect Muslims' rights, including provision of non-pork substitutes and advance publication of menus to provide notice of pending pork meals. The D. C. Circuit's test, squaring *Sherbert* with Supreme Court prison cases, then, was that a prison might reasonably regulate religious practices, but that it must make reasonable accommodations to such practices. This decision may be read as subjecting prison officials to something less than the "compelling state interest" test enunciated by the Supreme Court in *Sherbert* for the religious rights of the populace as a whole.

Other courts have taken slightly different tacks. In Ross v. Blackledge, 477 F.2d 616 (4th Cir. 1973), the Fourth Circuit came closer to *Sherbert* when it relied upon a "paramount state interest" test. It declared:

"[W]e held that the state may only restrict a prisoner's desire to practice religion 'upon a convincing showing that paramount state interests so require.' \* \* \* Brown v. Peyton, 437 F.2d 1228, 1231 (4th Cir. 1971). . . . While the decisions of prison officials are entitled to considerable weight, they are subject to judicial reviews 'to insure that the constitutional rights of prisoners are protected.'"

477 F.2d at 618. The case was remanded for an evidentiary hearing to determine if "there is adequate nourishment in the pork-free foods currently available to the prisoners . . . and on whether the state can establish an adequate interest for not providing some satisfactory form of alternative diet." 477 F.2d at 619.

Battle v. Anderson, 376 F.Supp. 402, 427 (E.D.Okl.1974), stated flatly that "food distribution practices which prevent Muslim inmates from adhering to their religious practices of abstaining from the consumption of pork and pork by-products" are invalid. 376 F.Supp. at 427.

"Such practices cannot be squared with the First Amendment rights of the inmate and, on the basis of the record in this case, are an unconstitutional application of state power."

*Ibid.* The court enunciated a test similar to *Sherbert* when the religious practice presented no threat to order in the institution:

"*Where the* precepts of a religious sect call for its adherents to engage in a religious *practice* which *does not present a threat to the security, discipline and good order of the institution, the state has the burden of justifying policies or practices which prevent such inmates from engaging in such religious practices.*" (Emphasis added.)

*Ibid.* The court left unclear precisely what justification would be adequate, but cited cases requiring a compelling state interest.

One court provided some indication of what degree of administrative burden it

viewed as justifying an infringement of religious rights. In Walker v. Blackwell, 411 F.2d 23 (5th Cir. 1969), the court cited the compelling state interest test as applicable to prisoners' religious rights. But it held that although there was no substantial burden caused to prisons by allowing a Passover Seder meal to Jewish inmates, providing a special diet to Muslim inmates after sunset during the thirty days of Ramadan, because of the administrative burden, security problems, and expense this would cause, was not required. *See also* on Muslim prisoner dietary requirements: Elam v. Henderson, 472 F.2d 582 (5th Cir.), *cert. denied*, 414 U.S. 868, 94 S.Ct. 177, 38 L.Ed.2d 117 (1973) (no showing that lack of special prison diet for Muslim prisoners has resulted in substantial deprivations); Abernathy v. Cunningham, 393 F.2d 775 (4th Cir. 1968) (adequate non-pork nourishment was available to prisoners); X. (Bryant) v. Carlson, 363 F.Supp. 928, 930 (E.D.Ill.1973) (sufficient alternative foods available); Northern v. Nelson, 315 F.Supp. 687 (N.D.Cal.1970), *aff'd*, 448 F.2d 1266 (9th Cir. 1971) (prison menu adequate); SaMarion v. McGinnis, 35 App. Div.2d 684, 314 N.Y.S.2d 715 (4th Dep't 1970) (Muslims should be provided whenever possible with pork-free meals, and when that is not practicable, alternative non-pork foods should be available).

A pattern emerges in the Muslim food cases. Courts cite a strong "compelling" test, but apply it with lesser strength to prisoners' rights to take account of seriously disruptive administrative burdens. Put another way, the cases require the least denigration of the human spirit and mind consistent with the needs of a structured correctional society. This balance is in general accord with the Supreme Court's recent discussion of the appropriate standard for First Amendment rights in the context of prisons in Procunier v. Martinez, 416 U.S. 396, 406–408, 94 S.Ct. 1800, 1808–09, 40 L. Ed.2d 224 (1974).

### 4. *Application of Standards*

While Muslim religious beliefs concerning diet can be satisfied simply by providing alternative non-pork foods, kosher dietary requirements cannot be satisfied quite so readily. Nonetheless, strong precedent for provision of kosher food is found in the Muslim food cases. And, balancing the more restrictive and burdensome orthodox Jewish requirements is the fact that there are but a handful of strictly observant Jews in the penal system as compared to the many adherents of the Muslim faith. Strong support is also found in the cases discussed above requiring prisons to undertake the substantial burden of providing clergy to represented faiths.

Under the precedents established by the Muslim dietary cases, at a minimum federal prisons must provide dietary alternatives to Jewish prisoners observing dietary laws that would not violate kosher requirements—for example, certain fruits, acceptable breads, cheeses, tinned fish, boiled eggs and vegetables, supplemented by hot kosher pre-cooked frozen meals. These diet alternatives must supply adequate nutrition for a person who is to be incarcerated for a long period.

It would be satisfactory to allow local or national Jewish community groups to provide kosher foods to orthodox Jewish prisoners. Cf. Kauffman v. Johnston, 454 F.2d 264 (3d Cir. 1972) (local community group provided kosher food to Jewish inmates of state prison); Stark v. Wyman, 59 Misc.2d 504, 299 N.Y.S.2d 686 (Kings Co.Sup.Ct.1969) (while state welfare agency was not required to increase orthodox family's food allowance to cover more expensive kosher food, court noted that such assistance would be available through private community groups).

The testimony indicated that prisons could purchase, under their normal food requisitioning procedures, pre-prepared, frozen, foil-wrapped kosher meals accompanied by disposable eating utensils; they are readily available from a num-

ber of manufacturers with numerous distributorships around the country. Such frozen meals, the testimony showed, are now widely available on airplanes, trains, buses, in hospitals, and at hotels and motels. These dinners could be prepared with virtually no administrative inconvenience by heating in regular prison kitchens. While the cost of these dinners would be somewhat higher than regular prison fare, the government does not contest the fact that only in the order of a dozen persons would have to be provided with such food, so that costs would not be significant. It is also worth noting that the Bureau of Prisons has traditionally had to provide numerous specialized diets in the medical treatment facilities that are a part of every prison.

A combination of these comparatively simple administrative procedures would result in a nutritionally sound diet consistent with kosher requirements with only minimal administrative inconvenience. The government has shown no serious, much less compelling, reasons why provision of a kosher diet for this defendant would affect prison security or discipline. Because solutions involving minimal administrative burdens are available, the court need not consider possibly burdensome solutions such as concentrating orthodox Jewish prisoners in one or two federal facilities where kitchens consistent with kosher requirements could be provided.

While the government has expressed a fear that if a kosher diet is provided prisons will be flooded with applications for it, the repetitive and spartan nature of such a diet under prison conditions would undoubtedly discourage those who are not sincere. Should the government be subjected to clearly spurious claims, it could ask for a showing of demonstrated adherence to, or belief in, orthodox laws. *See* United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); Theriault v. Carlson, 495 F.2d 390, 395 (5th Cir. 1974) (religious beliefs that are "obviously shams and absurdities and whose members are patently devoid of religious sincerity" are not entitled to First Amendment protection); M. Konvitz, Religious Liberty and Conscience: A Constitutional Inquiry 27–50 (1968).

However misguided and violent his past activities, the defendant is a religious person, an observant orthodox Jewish rabbi. To deprive him of opportunities to observe basic religious practices in light of his particular beliefs can only amount to a cruel and unusual form of punishment.

The facts in the recent case of United States v. Huss, 394 F.Supp. 752 (S.D. N.Y.1975), are somewhat different from the case before us. To the extent that the *Huss* decision is inconsistent with our legal conclusions, we most respectfully disagree with them.

## IV. *CONCLUSION*

It would be more convenient for authorities if all people were the same in religion and outlook. There are many procrustean beds in today's world designed to reduce populations to mass conformity—interchangeable human beings, like spare parts in a machine. And, perhaps, the authoritarian regimes of tomorrow will be able to achieve such results through new developments in biology and psychology. When that end is achieved the American experiment of freedom—of recognition that each person should be able to achieve his own spiritual and religious peace by whatever means he chooses that do no harm—can be abandoned as unnecessary. Until that day, federal courts will, we trust, continue to do their duty in enforcing the United States Constitution.

"It is certainly something in which a citizen of the United States may feel a generous pride that the government of his country extends protection to all persons within its jurisdiction; and that every blow aimed at any of them, however humble, come from what quarter it may, is 'caught upon the broad shield of our blessed Constitu-

tion and our equal laws.'" [Citing: Fossat's Case, 2 Wall. 703 (69 U.S. 703)].

Ho Ah Kow v. Nunan, 12 Fed.Cas. p. 252, 256 (No. 6,546) (Cal.C.C.1879) (Field, Circuit Justice).

In Mr. Justice Jackson's words,

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."

West Virginia State Bd. of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943). In this case the Constitution requires that the religious needs of the defendant to practice an important tenet of his faith be respected.

The hearings and analysis of applicable law confirm that no irresolvable conflict exists between the rights of the defendant and the practical needs of the correctional institutions. Nor does Jewish law require that the issue be posed in a way that prevents the just punishment of persons merely because they are orthodox Jews or members of some other faith that has special dietary or religious requirements. Defendant is constitutionally entitled to an order accompanying his sentence that allows him to conform to Jewish dietary laws. Without any undue inconvenience to the correctional institution, through utilization of some of the suggestions already adverted to and others that were described at the hearings or that can be developed locally, the issue can be resolved as it has been in cases in the past. The minor practical problems presented can be easily met if the government tries in good faith to do so.

Since this decision determines the rights of the defendant, the stay entered by this court requiring the government to keep defendant at the Federal Community Treatment Center in New York City is vacated. The defendant may be sent to an institution suitable to his needs and the requirements of the correctional service. The Director of the Federal Bureau of Prisons is directed to take precaution to accommodate the defendant's religious requirements in a manner not inconsistent with this opinion.

So ordered.